53 So.2d 840

## In re OPINION OF THE JUSTICES.
### No. 127.

Supreme Court of Alabama.
Aug. 20, 1951.

Senate Resolution No. 35.

Whereas, there is now pending in the Legislature of Alabama Senate Bill No. 436, conferring upon municipalities in this state certain powers similar to those heretofore conferred by other Southern states upon the municipalities therein, to the end that the municipalities in this state may compete with municipalities in other states for the location of industries; and

Whereas, a number of municipalities in this state contemplate exercising the powers conferred in the said Senate Bill for the purpose of inducing various manufacturing and industrial enterprises to locate in this state, thereby contributing to the achievement of a sound and proper balance of agriculture and industry in this state; and

Whereas, important constitutional questions are presented by said Senate Bill:

Now therefore, Be It Resolved by the Senate of Alabama that the Justices of the Supreme Court of Alabama are hereby respectfully requested to render their written opinion, as provided by Title 13, Section 34 of the Code of Alabama of 1940, on the following important constitutional questions:

1. Will bonds issued by a municipality, pursuant to authorization in the said Senate Bill, constitute indebtedness of the municipality within the meaning of Section 225 of the Alabama Constitution?

2. Will the enactment of the said Senate Bill constitute an authorization of municipalities to lend their credit or to grant public money or thing of value in aid of or to individuals, associations, or corporations, in violation of Section 94 of the Constitution?

The Senate of Alabama
State Capitol
Montgomery, Alabama
Gentlemen:

We are in receipt of Senate Resolution No. 35, propounding to the Justices of this court the following inquiries relative to Senate Bill No. 436, thereto attached:

"1. Will bonds issued by a municipality, pursuant to authorization in the said Senate Bill, constitute indebtedness of the municipality within the meaning of Section 225 of the Alabama Constitution?

"2. Will the enactment of the said Senate Bill constitute an authorization of municipalities to lend their credit or to grant public money or thing of value in aid of or to individuals, associations, or corporations, in violation of Section 94 of the Constitution?"

In answering question numbered 1, we beg to advise that in our opinion the bill attached to the inquiry does not constitute an indebtedness of the municipality within the meaning of Section 225 of the Alabama Constitution for the following reasons:

The purpose of the bill, as stated therein, is to authorize municipalities to acquire and lease self-liquidating projects for the purpose of promoting industry and trade by inducing manufacturing, industrial, and commercial enterprises to locate in the state, promoting the use of the agricultural products and natural resources of the state, and promoting a sound and proper balance in the state between agriculture and commerce and industry. The projects which municipalities are authorized to acquire and lease include properties suitable for use by any combination of two or more of the following: (a) any industry for the manufacturing, processing, or assembling of any agricultural or manufactured products, and (b) any commercial enterprise in storing, warehousing, distributing or selling products of agriculture, mining or industry. Each project is required by the terms of the bill to be self-liquidating; the municipality is prohibited from contributing property or funds to a project, and the entire cost of acquiring and equipping any project is required to be paid out of the proceeds from the sale of bonds issued under the act, except to such extent as any part of the project may be donated to the municipality.

A municipality is authorized to finance the acquisition of any project by the issuance of revenue bonds payable solely out of the revenues from the lease of the project. Before issuing any such bonds, the municipality is required to enter into a lease of that project for such rental and on such terms as shall assure sufficient revenues to pay the principal of and interest on the bonds, maintenance and insurance of the project, and the building up of any reserves deemed advisable in connection therewith. The bill expressly provides that the bonds, which must be made payable solely out of the revenues derived from such a lease, shall never constitute an indebtedness of the municipality within the meaning of any applicable constitutional provision and shall never constitute nor give rise to any pecuniary liability of the municipality or a charge against its general credit or taxing powers.

The bill specifically provides that a municipality shall not have the power to operate any project as a business or in any manner except as the lessor thereof.

This court has many times held that bonds of a municipality payable solely

out of revenues from a new project to finance which the bonds are issued does not constitute an indebtedness of the municipality within the meaning of Section 225 of the Constitution. The pertinent rule is stated in Re Opinion of the Justices, 226 Ala. 570, 148 So. 111, 114: "when the city purchases or constructs a system, no part of which has been owned theretofore by it, and no revenue theretofore created from it, the pledge of it and the income from it, with no other obligation of the city to pay the price in any respect does not divert funds or property of the city which could have been used for other purposes nor does it otherwise create a debt. Under such circumstances it would not be affected by section 225 of the Constitution."

The rationale of the stated rule was given exhaustive analysis in the case of Oppenheim v. City of Florence, 229 Ala. 50, 155 So. 859, and in Bankhead v. Town of Sulligent, 229 Ala. 45, 155 So. 869, 96 A. L.R. 1381. The following subsequent cases have affirmed the rule above stated: State ex rel. Radcliff v. City of Mobile, 229 Ala. 93, 155 So. 872; Randall v. State ex rel. City of Tuskegee, 233 Ala. 446, 172 So. 277; Smith v. Town of Guin, 229 Ala. 61, 155 So. 865, and In re Opinion of the Justices, 226 Ala. 18, 145 So. 481.

The foregoing cases involve the construction of statutes providing for the financing of facilities of various kinds by the issuance of revenues securities payable solely out of the revenue to be derived from the facilities to acquire which the securities were issued. And the bonds authorized by Senate Bill No. 436 falls within the scope of the foregoing adjudications by this court. The only substantial feature of Senate Bill No. 436 respecting the bonds and the remedy of the bond holders which differs from the bonds and securities provisions contained in the statutes considered in the above cited cases, is the provision permitting revenue bonds issued under Senate Bill No. 436 to be secured by a mortgage that is subject to foreclosure. But that provision of the presently considered bill was based on In re Opinion of the Justices, 252 Ala. 583, 42 So.2d 348, 351, where it was said "under our cases and decisions we do not think it is controlling

that the mortgage is subject to foreclosure when set up as we have indicated."

We therefore answer inquiry numbered 1 in the negative.

Your second inquiry is whether enactment of the bill will constitute an authorization of municipalities to lend credit or to grant public money or thing of value in aid of or to individuals, associations or corporations in violation of Section 94 of the Constitution of Alabama, 1901.

Section 94 of the Constitution provides: "The legislature shall not have power to authorize any county, city, town, or other subdivision of this state to lend its credit, or to grant public money or thing of value in aid of, or to any individual, association or corporation whatsoever, or to become a stockholder in any such corporation, association, or company, by issuing bonds or otherwise."

In Re Opinion of the Justices, 254 Ala. 506, 49 So.2d 175, 178, the Justices summed up their holdings respecting Section 94 as follows: "The constitutional provision now appearing as § 94 of the Constitution of 1901 was originally adopted in substantially its present form as Article IV, Section 55 of the Constitution of 1875. This court has many times considered this constitutional provision and has fully discussed its purpose, the evils it was designed to prevent and the meaning of its language. Garland v. Board of Revenue of Montgomery County, 87 Ala. 223, 6 So. 402, 403. It has been pointed out that the evil to be remedied is the *expenditure of public funds* in aid of private individuals or corporations, regardless of the form which such expenditure may take, and that Section 94 prohibits, in the words of the decision in Garland v. Board of Revenue, supra, 'any aid * * * *by which a pecuniary liability is incurred*'". [Italics supplied.]

A review of all the cases in which the Courts of Alabama have held a statute or proposed action invalid because in violation of Section 94 of the 1901 Constitution (or its predecessor, Article IV, Section 55, of the 1875 Constitution) reveals that each of those cases has involved the incurring by a municipality or a county of a pecuniary

liability. Those cases are the following: Garland v. Board of Revenue of Montgomery County, 87 Ala. 223, 6 So. 402; Southern Railway Co. v. Hartshorne, 162 Ala. 491, 50 So. 139; Rogers v. White, 14 Ala.App. 482, 70 So. 944; Swindle v. State ex rel. Pruitt, 225 Ala. 247, 143 So. 198; Griffin v. Jeffers, 221 Ala. 649, 130 So. 190; Stone v. State ex rel. Mobile Broadcasting Corporation, 223 Ala. 426, 136 So. 727.

An analysis of the bill reveals that although the municipality may acquire an industrial project and may finance its acquisition by the issuance of revenue bonds, yet the pecuniary relationship of the municipality to a project acquired under the bill involves no expenditure of public money and the incurring of no liability that must or can be taken care of by taxation. The bill does not authorize, and indeed prohibits any contribution by a municipality toward the acquisition of a project and the incurring of any pecuniary liability.

Similar legislation has been enacted in several southern states. A Kentucky statute, in many respects similar to Senate Bill No. 436, was considered by the Court of Appeals of Kentucky in Faulconer v. City of Danville, 313 Ky. 468, 232 S.W.2d 80. The Kentucky court held that the Act in question and the proposed issue of bonds thereunder did not violate the provisions of the Kentucky Constitution similar to Section 94 of the Constitution of Alabama. The holding of the Kentucky court is based upon the fact that the bonds to be issued by the city were revenue bonds merely and did not constitute general obligations of indebtedness.

None of the evils which Section 94 of the Constitution of Alabama, 1901, is designed to eliminate are involved in the actions of a municipality authorized by Senate Bill No. 436.

Respectfully submitted,
J. ED. LIVINGSTON
Chief Justice
ARTHUR B. FOSTER
THOMAS S. LAWSON
ROBERT T. SIMPSON
DAVIS F. STAKELY
Associate Justices

To the Senate of Alabama
State Capitol
Montgomery, Alabama
Dear Sirs:

In response to your inquiries embodied in Senate Resolution No. 35 offered by Mr. Andrews, you are advised that it is my opinion that both of the questions posed by the resolution should be answered in the affirmative. I repeat the inquiries.

"1. Will bonds issued by a municipality, pursuant to authorization in the said Senate Bill, constitute indebtedness of the municipality within the meaning of Section 225 of the Alabama Constitution?

"2. Will the enactment of said Senate Bill constitute an authorization of municipalities to lend their credit or to grant public money or thing of value in aid of or to individuals, associations, or corporations, in violation of Section 94 of the Constitution?"

The proposed law if it can be enacted without offending the constitution placing limitations upon the power of the legislature, will be a general law, authorizing all municipalities in Alabama to issue their respective bonds to run for a term of 30 years with the right to refund the same. On the face of the act it proposes to create a debt against the municipality of a limited character, payable out of revenues accruing in the form of rents from the projects mentioned in the bill, which the municipality is authorized to operate as lessor, requiring constant supervision and effort on the part of the governing board and officials of said municipality to procure leases, collect rents and apply proceeds to the amortization of the bonds.

Sections 2 and 3 of the proposed act provide as follows:

"Section 2. Legislative intent. It is the intent of the legislature by the passage of this act to authorize municipalities to acquire, own, and lease projects for the purpose of promoting industry and trade by inducing manufacturing, industrial and commercial enterprises to locate in this state, promoting the use of the agricultural products and natural resources of this state, and promoting a sound and proper balance

in this state between agriculture, commerce and industry. It is intended that each project be self-liquidating. It is not intended hereby to authorize any municipality itself to operate any manufacturing, industrial or commercial enterprise. This act shall be liberally construed in conformity with the said intent.

"Section 3. *Additional powers conferred on municipalities.* In addition to any other powers which it may now have, each municipality shall have the following powers: (1) To acquire, whether by construction, purchase, gift or lease, and to equip one or more projects, which shall be located within this state and may be located within or without the municipality, or partially within or partially without the municipality, but which shall not be located more than fifteen miles outside of the corporate limits of the municipality; (2) To lease to others any or all of its projects for such rentals and upon such terms and conditions as the governing body may deem advisable and as shall not conflict with the provisions of this act; and (3) To issue revenue bonds for the purpose of defraying the cost of acquiring, by construction and purchase, or either thereof, and of equipping any project, and to secure the payment of such bonds, all as hereinafter provided. No municipality shall have the power to operate any project as a business or in any manner except as lessor thereof."

Section 5 of said act provides *inter alia:*

"Section 5. *Security for Bonds.* The principal of and interest on any bonds issued under the authority of this act shall be secured by a *pledge of the revenues out of which such bonds shall be made payable, may be secured by a mortgage covering all or any part of the project from which the revenues so pledged may be derived, and may be secured by a pledge of the lease of such project.* * * * provided, however, that in making any such agreements or provisions a municipality shall not have the power to obligate itself except with respect to the project and the application of the revenues therefrom, and shall not have the power to incur a pecuniary liability or a charge upon its general credit or against its taxing powers. The proceedings authoriz-

ing any bonds hereunder and any mortgage securing such bonds may provide that, in the event of default in payment of the principal of or the interest on such bonds or in the performance of any agreement contained in such proceedings or mortgage, such payment and performance may be enforced by *mandamus* or by the appointment of a *receiver in equity* with power to charge and collect rents and to apply the revenues from the project in accordance with such proceedings or the provisions of such mortgage. * * * No breach of any such agreement shall impose any pecuniary liability upon a municipality or any charge upon its general credit or against its taxing powers." [Italics supplied.]

In Section 6 it is provided, among other things, that "prior to the issuance of such bonds, the municipality shall lease the project to a lessee under an agreement conditioned upon completion of the project and providing for payment to the municipality of such rentals as, upon the basis of such determinations and findings, will be sufficient (a) to pay the principal of and interest on the bonds issued to finance the project, (b) to build up and maintain any reserves deemed by the governing body to be advisable in connection therewith, and (c) unless the agreement of lease obligates the lessee to pay for the maintenance and insurance of the project, to pay the costs of maintaining the project in good repair and keeping it properly insured."

It is also provided in Section 8 that "The cost of acquiring and equipping any project shall be deemed to include the following: the actual cost of the construction of any part of a project which may be constructed, including architect's and engineer's fees; the purchase price of any part of a project that may be acquired by purchase; the purchase price of the equipment for any project; the actual cost of installing such equipment; all expenses in connection with the authorization, sale and issuance of the bonds to finance such acquisition and equipment; and the interest on such bonds for a reasonable time prior to construction, during construction, and for not exceeding six months after completion of construction."

Section 11 provides:

"Section 11. *Exemption from Taxation.* The bonds authorized by this act and the income therefrom, all mortgages executed as security therefor, all lease agreements made pursuant to the provisions hereof, and all projects and revenue derived from any lease thereof shall be exempt from all taxation in the State of Alabama."

Section 12 provides:

"Section 12. *Construction of Act.* Neither this act nor anything herein contained shall be construed as a restriction or limitation upon any powers which a municipality might otherwise have under any laws of this state, but shall be construed as cumulative; and this act shall not be construed as requiring an election by the voters of a municipality prior to the issuance of bonds hereunder by such municipality."

While the proposed law limits the character of the indebtedness which the municipality will contract by the issuance of its bonds, it does not limit the amount thereof, nor does it limit the number of the projects to be promoted by each of said municipalities. Therefore the unrestricted authority which it confers to issue bonds for the purposes specified, regardless of the assessed value of the property therein and the state of its existing indebtedness, clearly offend § 225 of the Constitution of 1901, which provides:

"Sec. 225. No city, town, or other municipal corporation having a population of less than six thousand, except as hereafter provided, shall become indebted in an amount including present indebtedness, exceeding five per centum of the assessed value of the property therein, except for the construction of or purchase of water works, gas, or electric lighting plants, or sewerage, or for the improvement of streets, for which purposes an additional indebtedness not exceeding three per centum may be created; provided, this limitation shall not affect any debt now authorized by law to be created, nor any temporary loans to be paid within one year, made in anticipation of the collection of taxes, not exceeding one-fourth of the annual revenues of such city or town. All towns and cities having a population of six thousand or more, also Gadsden, Ensley, Decatur, and New Decatur, are hereby authorized to become indebted in an amount including present indebtedness, not exceeding seven per centum of the assessed valuation of the property therein, provided that there shall not be included in the limitation of the indebtedness of such last described cities and towns the following classes of indebtedness, to wit: Temporary loans, to be paid within one year, made in anticipation of the collection of taxes, and not exceeding one-fourth of the general revenues, bonds, or other obligations already issued, or which may hereafter be issued for the purpose of acquiring, providing, or constructing school houses, water works, and sewers; and obligations incurred and bonds issued for street or sidewalk improvements, (a) where the cost of the same, in whole or in part, is to be assessed against the property abutting said improvements; provided, that the proceeds of all obligations issued as herein provided, in excess of said seven per centum shall not be used for any purpose other than that for which said obligations were issued. Nothing contained in this article shall prevent the funding or refunding of existing indebtedness. This section shall not apply to the cities of Sheffield and Tuscumbia." See Baisden v. Greenville, 215 Ala. 512, 111 So. 2; Town of Valley Head v. Mishler, 236 Ala. 520, 183 So. 664; First Nat. Bank v. Town of Luverne, 235 Ala. 606, 180 So. 283.

The declared purpose of the scheme which the proposed law fosters, is to induce business interests to migrate to and settle in Alabama and become lessees of publicly owned and controlled tax-free projects established under the scheme and to operate the same in competition with the inhabitants of the cities and towns, contemplating the execution of leases evidencing the grant of a leasehold interest or estate in the lessees, a favored class, leaving the burdens of maintaining the municipal governments on the citizens and taxpayers thereof. Such grant would constitute a *"thing of value"*, within the contemplation of § 94 of the Constitution.

The prohibitions of Section 94 of the Constitution of 1901 were first written into the Constitution of 1875 following the "tragic era", resulting from the War between the States and the profligacy of the "carpet bag" regime, inducing the local governmental bodies to incur liabilities rested on *mere hope* without well founded planning and economic support—socialism in substance and effect—leading to government ownership and bankruptcy, and these were the controlling reasons inducing the people to write into the constitution the limitations embodied in said Section 94. The present drift is leading to socialism. See address by Hon. Walter W. Kennedy, President of The First National Bank of Montgomery, entitled "The Diminishing Value of the Dollar", reproduced in The Alabama Lawyer of July, 1951, p. 285, 296. Section 94 provides: "The legislature shall not have power to authorize any county, city, town, or other subdivision of this state to lend its credit, or to grant public money *or thing of value* in aid of, or to any individual, association, or corporation whatsoever, or to become a stockholder in any such corporation, association, or company, by issuing bonds or otherwise."—[Italics supplied.]

In Stone, County Treasurer, v. State ex rel. Mobile Broadcasting Corporation, 223 Ala. 426, 428, 136 So. 727, 729, wherein the County of Mobile gave to the broadcasting company to be established in Mobile a subscription of $500 per month to pay for advertising Mobile County over the broadcasting company, the county treasurer challenged the validity of said subscription. The Supreme Court in sustaining his challenge, observed:

"It is a question of serious doubt whether or not the making of the contract was a setting aside, an appropriation or use of county funds or revenue, but whether that is so or not, it was the granting to the Mobile Broadcasting Corporation, a contract to pay money—a thing of value—to aid in the promotion of a broadcasting station, a private enterprise; and to construe this statute as granting such power would render it obnoxious to the

provisions of section 94 of the Constitution, which provide: 'The legislature shall not have power to authorize any county, city, town, or other subdivision of this state to lend its credit, *or to grant public money or thing of value in aid of, or to any individual, association,* or corporation whatsoever, or to become a stockholder in any such corporation, association, or company, by issuing bonds or otherwise.' Garland v. Board of Revenue of Montgomery County, 87 Ala. [223] 227, 6 So. 402, 403; Southern Ry. Co. v. Hartshorne, 162 Ala. 491, 50 So. 139; Rogers, Treasurer, v. White, Secretary, 14 Ala.App. 482, 70 So. 994; Griffin v. Jeffers, 221 Ala. 649, 130 So. 190.

"In Garland v. Board of Revenue, supra, construing and applying this section of the Constitution, then section 55 of article 4 of the Constitution of 1875, it was said: *'In no project originated by individuals, whether associated or otherwise, with a view to gain, are the municipalities named permitted to participate in such manner as to incur pecuniary liability.'* (Italics supplied.)

"And in Southern Ry. Co. v. Hartshorne, supra, referring to that decision, it was observed: 'This section (55) has, as stated, become section 94 of the Constitution of 1901, and hence is impressed in meaning and effect with the construction put upon it in Garland's Case. In the light of that decision we need hardly add that the very motive leading to the creation of the conditions to prevent the recurrence of which the provision was written was anticipated public benefits. If the public benefits were held to be sufficient to take the act without the prohibition, then its ordaining in two Constitutions in this state was wholly vain. In the Garland Case a pecuniary liability was attempted to be incurred. The same reason that forbade that course of procedure to aid private enterprises is present to condemn the diversion of public revenue in this instance. The provision is no more explicit against becoming a stockholder or affording credit by the issuance of bonds than it is that money shall not be granted. In all en-

terprises like railroads, canals, pikes, manufacturing establishments, etc., benefits naturally accrue to the community concerned, and it is common experience that this is true. Because it is true the trustees of government are and have always been amenable to it as an influence to induce the lending of the credit or granting the funds or property of the subordinate governments to the aid of such enterprises as foreshadow public benefits. This disposition, natural and inevitable of gratification if not restrained, cannot be gratified by those who have control. The very existence of this disposition has resulted in the creating of the prohibition. To permit it to yet prevail is to annul one of the wisest of the Constitution's provisions.' 162 Ala. 494 [495], 50 So. 139.

"Appellee insists that 'if we place upon Section 94 of the Constitution, the very narrow and strained construction' so as to bring the contract involved in this litigation within its influence, to use the language of the brief, 'then we can hardly conceive of any contract that the county can enter into that would not violate this constitutional provision'; that if the county should enter into a contract with established mediums of advertising such as the big daily papers of the state, it would be giving financial aid to such papers, and therefore would come within the influence of such decisions.

"The answer to this argument is that the cause giving birth to this section of the Constitution was the recognized fact that 'the trustees of government are and have always been amenable to' the subtle influence of anticipating that by establishing and promoting a new industry or institution in a community, though established for private gain, it brings to the community where established, some public benefits, and that such influence encourages the improvident expenditure of public money and the incurring of governmental liabilities that must be taken care of by taxation. No such influence could or would be present in negotiating a contract with an established medium of advertising, and the trustees of the government in negotiating and entering

into such contract would be aided by competition, and deal at arm's length with only the benefit that would result from such advertising in view." 223 Ala. 426, 428–429, 136 So. 727, 729.

The schemes proposed to be authorized and promoted through municipal corporations are fraught with all the blandishment and subtle influences tempting the promotion of such industries which are to be operated for private gain, free of taxation, and leave the burden of maintaining the government by taxation, as hereinbefore observed, on all other inhabitants of said municipalities. This is one of the evils which § 94 of the Constitution of 1901 intended to prevent.

While the inquiries do not cover the matters of which I now write the legislature is bound to be confronted in the process of legislation attempting to establish this as a general law of the state with the provisions of Section 222 of the Constitution of 1901, which provides:

"The legislature, after the ratification of this constitution, shall have authority to pass general laws authorizing the counties, cities, towns, villages, districts, or other political subdivisions of counties to issue bonds, (a) but *no bonds shall be issued under authority of a general law unless such issue of bonds be first authorized by a majority vote by ballot of the qualified voters of such county, city, town, village, district, or other political subdivision of a county, voting upon such proposition.* * * *" Code of 1940, Vol. 1, p. 229.

Section 12 of the proposed act and many others are manifestly an encroachment upon the power of the judiciary which is invested with authority to construe acts of the legislature and determine their constitutionality. The legislature by its interpretation cannot destroy this power vested in a separate body of magistracy under the constitution. Constitution of 1901, §§ 42 and 43.

I am, therefore, of opinion that said proposed law impinges the Constitution in the respects above noted.

Respectfully submitted,
JOEL B. BROWN
Associate Justice