## 𝔖taunton

FAIRFAX COUNTY INDUSTRIAL DEVELOPMENT AUTHORITY v. LEWIS
M. COYNER, DIRECTOR, ETC.

September 9, 1966.

Record No. 6375.

Present, All the Justices.

*Thomas O. Lawson* (*Thomas H. Monahan*; *Kelly, Farley & Lawson*, on brief), for the petitioner.

*John T. Hazel, Jr.* (*Grayson P. Hanes*, on brief), for the respondent.

*Thomas H. Willcox, Jr.*; *Hugh L. Patterson*; *Willcox, Savage, Lawrence, Dickson & Spindle* for Tidewater Virginia Development Council, et al., *amicus curiae.*

*Donald C. Kilgore*; *H. Thomas Fennell, Jr.*; *Cooper, Spong and Davis* for Portsmouth Port and Industrial Commission, *amicus curiae.*

I'Anson, J., delivered the opinion of the court.

This is an original proceeding for a writ of mandamus filed under § 17-96, Code of 1950, 1960 Rep. Vol., by the Fairfax County Industrial Authority, hereinafter generally referred to as the Authority, which has been organized and is operating under the provisions of Chapter 643, Acts of Assembly, 1964, p. 975, to compel the respondent, Lewis M. Coyner, director of finance of Fairfax county, Virginia, to pay to the Authority the sum of $10,000, appropriated by the Fairfax county board of supervisors to cover the initial cost incurred by the Authority in acquiring land and other preliminary expenses for the construction of a building or buildings to be leased by it to a private corporation. When the respondent expressed doubt as to the constitutionality of the act and his authority to pay the money, the present proceeding was filed.

The Act is entitled:

"An Act to create political subdivisions within the cities of Virginia Beach and Danville, and within the County of Fairfax; to provide for the composition, powers, duties and liabilities thereof and other matters pertaining thereto, to provide for the issuance of certain bonds; and to prescribe the terms and conditions governing the issuance of such bonds."

Its pertinent provisions may be summarized as follows:

Section 1 creates political subdivisions to be known as the industrial development authorities of the respective cities and county named.

Sections 2, 3, 4 and 5 set out the steps required for organization and activation of an Authority in the respective cities and county.

Section 6 gives the Authority power to contract and be contracted with; to sue and to be sued; to acquire real and personal property; to construct, for sale or lease, warehouses, factories or manufacturing facilities of any kind; and to do all acts and things which may be reasonably necessary and convenient to carry out its purposes and powers.

Section 7 authorizes the Authority to foster and stimulate the development of industry in the area within its jurisdiction.

Section 10 authorizes the councils of the cities of Virginia Beach and Danville and the board of supervisors of Fairfax county to make appropriations and provide funds for the operation of the Authority.

Section 11 empowers the Authority to "issue such types of bonds as it may determine, including (without limiting the generality of the foregoing) bonds payable, both as to principal and interest: (a) from its revenues generally; (b) exclusively from income and revenues of a particular 'facility'; * * * or (c) exclusively from income and revenues of certain designated facilities whether or not they are financed in whole or in part from the proceeds of such bonds. Any such bonds may be additionally secured by a pledge of any grant or contributions from the federal government, Commonwealth of Virginia, or any political subdivision which is a part of the Authority * * *."

Section 12 provides that "The bonds and other obligations of the Authority (and such bonds and obligations shall so state on their face) shall not be a debt of the Commonwealth or any political subdivision thereof and neither the Commonwealth nor any political subdivision thereof other than the Authority shall be liable thereon, nor, shall such bonds or obligations be payable out of any funds or properties other than those of the Authority. * * * Bonds of the Authority are declared to be issued for an essential public and governmental purpose."

On January 21, 1966, the Fairfax County Industrial Development Authority, in conformity with the stated purpose of the Act, entered into separate agreements with Karloid Corporation and Hazelton Laboratories, Inc. Under the agreement with Karloid the Authority agreed to purchase from it two and one-half acres of land, upon which it planned to construct a building or buildings containing laboratories and research facilities which it proposed to lease to Hazelton. It was agreed that the entire cost of the project con-

templated would be covered exclusively by the sale of revenue bonds to be issued by the Authority, and the principal and interest on the bonds proposed to be issued would be payable from the revenue derived by the Authority from leasing the facility. Karloid was given an option to purchase the land with the improvements thereon for $50,000 at the expiration of Hazelton's lease.

The Authority also agreed, in its contract with Karloid, to request a voluntary appropriation from the board of supervisors of Fairfax county in an amount sufficient to cover the cost incurred in purchasing the land and other incidental expenses pending the sale of the revenue bonds, which amount it would reimburse the county upon the sale of the bonds.

Under the agreement with Hazelton, the Authority agreed to construct a building or buildings on the land in accordance with the specifications prepared by Hazelton and lease the land and improvements thereon to it at a rental sufficient to pay the bonds proposed to be issued, with interest, at maturity.

Both agreements were contingent upon the Authority's sale of the revenue bonds.

On February 2, 1966, the county board of supervisors appropriated $10,000, as requested by the Authority.

The questions presented are:

(1) Does the title of Chapter 643 sufficiently express the object of the Act so as to comply with § 52 of the Constitution of Virginia?

(2) Is the creation of an Industrial Development Authority to finance and construct facilities to be leased to private industry, pursuant to the provisions of Chapter 643, for a public purpose and thus a proper function of government?

(3) Does the Act violate the provisions of §§ 185 and 188 of the Constitution of Virginia?

The questions will be answered in the order enumerated above.

## I.

We have repeatedly held that the purpose of § 52 of the Constitution, which requires that the object of a law "shall be expressed in its title" does not require the title to be an index or digest of the various provisions of the Act. The section is designed to prevent employment of deceptive titles which would conceal rather than reveal the true character of legislation; to prevent the

members of the General Assembly and the public from being misled by the title; and to prohibit the bringing together into one act subjects which are adverse or dissimilar and have no kindred connection. The section was not intended to block honest legislation, and it is to be liberally construed. All that is required under § 52 is that the subjects embraced in a statute but not specified in the title be germane to or in furtherance of the objects expressed in the title, or have a legitimate and natural association therewith. *Doe* v. *Brown*, 203 Va. 508, 514, 125 S. E. 2d 159, 164; *Kingan, Inc.* v. *City of Richmond*, 198 Va. 820, 822, 97 S. E. 2d 11, 13, 14; *Fallon Florist* v. *City of Roanoke*, 190 Va. 564, 587, 58 S. E. 2d 316, 327.

It was obviously not necessary to include every provision of Chapter 643 in the title of the Act. What the Act authorizes to be done has a legitimate and kindred association with its title. It cannot be said that anyone would be misled by the title, which is sufficiently explicit to comply with § 52 of the Constitution.

## II.

■ It is an elementary principle of constitutional law that the General Assembly does not function under a grant of powers, and it may enact any law which is not prohibited by the Constitution of Virginia. Our Constitution differs from the Federal Constitution in that the Federal Constitution is a grant of specific powers. All acts of the legislature are presumed to be constitutional unless the contrary is clearly shown, and every reasonable doubt shall be resolved in favor of their constitutionality. Thus courts cannot strike down a statute enacted by the General Assembly unless it clearly appears that such statute does contravene some provision of the Constitution. *Almond* v. *Day*, 199 Va. 1, 6, 97 S. E. 2d 824, 828; *Almond* v. *Gilmer*, 188 Va. 822, 834, 51 S. E. 2d 272, 276; *Roanoke* v. *Michael's Bakery Corp.*, 180 Va. 132, 142, 143, 21 S. E. 2d 788, 793.

Over a period of many years the Commonwealth has taken action to stimulate and encourage the development of agriculture, trade, commerce and industry to promote the welfare and prosperity of its people.

Indicative of the State's interest in "agriculture and industrial development" was the creation of produce market authorities, Title 3, Chapter 7.1, Article 1, of the Code of 1950, as amended (§§ 3-79.1 through 3-79.18, Chapter 407, Acts of Assembly 1954). Under the

provisions of the Act certain cities and counties of the State were authorized by the General Assembly to establish authorities which would provide facilities for the buying, selling and distribution of perishable farm produce.

In a mandamus proceeding involving the constitutionality of the Produce Market Loan Fund Act, Title 3, Chapter 7.1, Article 2, Code of 1950, as amended (§§ 3-79.19 through 3-79.27, Chapter 453, Acts of Assembly 1954), we held that the Richmond Produce Market Authority, created under Chapter 407, was generally for the "State's benefit" and not strictly for the purpose of promoting "private enterprise"; that it would serve a public purpose and thus was a proper function of government; and that a loan made to the Authority from the Produce Market Loan Fund would not violate § 185 of the Constitution. *Harrison* v. *Day*, 200 Va. 750, 107 S. E. 2d 585 (1959).

In *Harrison* v. *Day*, 200 Va. 764, 107 S. E. 2d 594 (1959), we held that the acquisition and development and operation of harbor facilities in Hampton Roads was for a public purpose and thus a proper governmental function. We later held in *Harrison* v. *Day*, 202 Va. 967, 972, 973, 121 S. E. 2d 615, 619, that the leasing of the facilities by the Ports Authority to a private corporation did not change its public character even though the private industry may benefit therefrom.

In the recent case of *Inlet Authority* v. *Bastian*, 206 Va. 906, 908, 909, 147 S. E. 2d 131, 133, we held that the Act of 1960, ch. 227, p. 294, creating the Rudee Inlet Authority for the purpose of acquiring, maintaining and operating piers, yacht basins, marinas and other facilities for pleasure craft and fishing boats for use by the general public was for a public purpose. But we said that the provisions of the Act granting the Authority the power of eminent domain, which was not given to the Authority under the provisions of Chapter 643 in the present case, would permit it to take private property for private use, and held that the granting of such power was unconstitutional.

Even a casual reading of the provisions of Chapter 643 reveals that the primary and dominant purpose of the Act is to promote the economy of the State and to contribute to the welfare of its people within the areas designated. The fact that there was no express finding in the Act that the promotion of industrial development in the cities of Virginia Beach and Danville and the county of

Fairfax that the Authority was to serve a public purpose is of no importance. Section 12 of the Act does provide, however, that the revenue bonds issued by the Authority in carrying out its purpose were to be issued for "an essential public and governmental purpose."

Moreover, by Acts of Assembly, 1962, ch. 356, p. 493, Code § 2-57.1,[1] the General Assembly recognized, in the creation of a department of government to promote industrial development throughout the counties, cities and towns of the Commonwealth, that such development was essential to the State's economy and the welfare of its people.

Now counties, cities and towns throughout the State are authorized to establish industrial development authorities for the promotion of industry and trade. Acts of Assembly, 1966, ch. 651, p. 998 (codified as §§ 15.1-1373 through 15.1-1390). The provisions of that chapter closely parallel the provisions of Chapter 643.

The legislative determination that the promotion of industrial development is for a public purpose and thus a proper governmental function is presumed to be correct. There is nothing in the Constitution which prohibits the General Assembly from creating industrial authorities and clothing them with the power to finance and construct facilities to be leased to private industry pursuant to the provisions of Chapter 643. Courts cannot interfere with what the General Assembly has declared to be a public purpose and thus a function of government unless the judicial mind conceives that the legislative determination is without reasonable relation to the public interest or welfare and is beyond the scope of legitimate government. We cannot here say that such legislative determination has no reasonable relation to the public interest or welfare.

The fact that the Authority proposes to issue revenue bonds for the financing and construction of an industrial facility to be leased to a private user does not make the Act unconstitutional. Even though some private individual or corporation incidentally benefits from the financing, construction and use of the proposed facility, its public purpose and character are not destroyed. *Harrison* v. *Day, supra*, 202 Va. at pp. 972, 973, 121 S. E. 2d at p. 619; *Button* v. *Day*, 205 Va. 629, 638, 139 S. E. 2d 91, 97. Nor does the grant-

---

(1) Act amended and Code section changed to § 2-57.01, Acts of 1964, ch. 328, p. 536. The "Division of Industrial Development and Planning" was redesignated the "Division of Industrial Development," Acts of 1966, ch. 55, pp. 112, 113, 114.

ing of an option to Karloid to purchase the property at the termination of Hazelton's lease destroy the public character of the enterprise. See *Darnell* v. *County of Montgomery*, 202 Tenn. 560, 308 S. W. 2d 373, 374, 375.

Having held that authorities created for the purpose of acquisition and development and operation of produce markets, harbor and port facilities, and marinas for public use were for a public purpose and a proper governmental function, it would indeed be an anomaly for us to say that an authority created for the purpose of stimulating and promoting industrial development, which would contribute to the economy of the State and create jobs for its people, was not for a public purpose and thus not a proper function of government.

For a few of the many cases from other jurisdictions holding that the action of political subdivisions in financing and constructing buildings to be leased to a private industry in order to promote the industrial development of a particular area of a State was for a public purpose and thus a proper function of government, see *Holly* v. *City of Elizabethton*, 193 Tenn. 46, 241 S. W. 2d 1001 (cited by this Court in *Harrison* v. *Day*, *supra*, 202 Va. at p. 974, 121 S. E. 2d at p. 620); *Faulconer* v. *City of Danville*, 313 Ky. 468, 232 S. W. 2d 80; *City of Frostburg* v. *Jenkins*, 215 Md. 9, 136 A. 2d 852; *Green* v. *City of Mt. Pleasant*, 256 Iowa 1184, 131 N. W. 2d 5 (1964); *Industrial Development Authority* v. *Eastern Kentucky Regional Planning Commission* (Ky.), 332 S. W. 2d 274, 276, 278 (1960).

Thus we hold that Chapter 643, authorizing the Authority to undertake the financing and construction of facilities to be leased by it to private industry in order to stimulate industrial development within the area for which it was created, serves primarily a public purpose and thus constitutes a proper function of government.

## III.

The credit clause of § 185 of the Virginia Constitution provides that, "Neither the credit of the State, nor any county, city or town, shall be, directly or indirectly, under any device or pretense whatsoever, granted to or in aid of any person, association or corporation." The stock or obligation clause of the section provides, "nor shall the State, or any county, city or town subscribe to or become interested in the stock or obligations of any company, association, or corporation, for the purpose of aiding in the

construction or maintenance of its work * * *." The internal improvement clause provides that the State shall not "become a party to or become interested in any work of internal improvement, except public roads * * *."

Under § 12 of Chapter 643, the bonds and other obligations of the Authority shall state on their face that they "shall not be a debt of the Commonwealth or any political subdivision thereof and neither the Commonwealth nor any political subdivision thereof other than the Authority shall be liable thereon * * *."

It is clear from the language of § 12 of the Act that neither the State nor Fairfax county grants its credit or becomes liable in any manner for the payment of the bonds and obligations of the Authority. The revenue bonds are to be issued by the Authority solely under and by virtue of the terms of the Act, and they shall state on their face that they shall not be a debt of the State or of Fairfax county and neither the State nor Fairfax county shall be liable thereon. Thus the holders of the bonds issued by the Authority are to look only to the "special fund" created from rentals on properties of the Authority for payment of the principal and interest due thereon. Since the revenue bonds are not a debt or obligation of either the Commonwealth or Fairfax county, there is no violation of the credit clause of § 185. *Almond* v. *Gilmer, supra,* 188 Va. at pp. 842-844, 51 S. E. 2d at pp. 280, 281. See also *Button* v. *Day,* 204 Va. 270, 272, 273, 130 S. E. 2d 459, 461, 462.

The "stock or obligations" clause of § 185 of the Constitution operates to prevent the State and counties, cities and towns from subscribing to or becoming interested in the stock and obligations of private companies when the transaction is for the purpose of aiding in the construction or maintenance of such company. *Harrison* v. *Day, supra,* 200 Va. at pp. 753, 754, 107 S. E. 2d at p. 587; *Almond* v. *Day,* 197 Va. 782, 792, 91 S. E. 2d 660, 667.

Since the primary purposes of the Act is to stimulate industry and to promote the welfare of the people of the designated areas of the State, and neither the State, Fairfax county, nor the Authority is given the power under the Act to purchase stock or assume any of the obligations of a private corporation, there is no violation of the "stock or obligations" clause.

The Act does not violate the "internal improvement" clause of § 185 of the Constitution. This provision is not restrictive of the State's exercise of its governmental function. *Harrison* v. *Day, supra,*

200 Va. at pp. 754, 755, 756, 107 S. E. 2d at p. 587, 589; *Almond v. Day, supra,* 199 Va. at p. 8, 97 S. E. 2d at p. 830; *Shenandoah Lime Co. v. Governor,* 115 Va. 865, 872, 80 S. E. 753, 755.

■ Having determined that Chapter 643, creating the Industrial Authority and empowering it to issue revenue bonds for the construction of a facility to be leased to a private industry, was to serve a public purpose and thus constituted a proper function of government, there is no violation of § 188[2] of the Constitution. *Harrison v. Day, supra,* 200 Va. at p. 775, 107 S. E. 2d at p. 601.

No public funds are here used for a private purpose. The $10,000 appropriated by the county board of supervisors was purely voluntary and was to be repaid when the proposed revenue bonds were sold, but even if the proposed bonds are not sold the money appropriated was for a public purpose and no tax funds would have been used for a non-governmental purpose.

Like attacks have been made on statutes similar to Chapter 643 in several other States with like or somewhat similar constitutional provisions, but by the great weight of authority they have been held to be constitutional. See *Faulconer v. City of Danville, supra; Holly v. City of Elizabethton, supra; Bennett v. City of Mayfield* (Ky.), 323 S. W. 2d 573; *Newberry v. City of Andalusia,* 257 Ala. 49, 57 So. 2d 629; *Village of Deming v. Hosdreg Co.,* 62 N. M. 18, 303 P. 2d 920; *McConnell v. City of Lebanon,* 203 Tenn. 498, 314 S. W. 2d 12; *In re Opinion of the Justices,* 256 Ala. 162, 53 So. 2d 840; *Green v. City of Mt. Pleasant, supra.* For cases holding contrary see *Village of Moyie Springs v. Aurora Mfg. Co.,* 82 Idaho 337, 353 P. 2d 767; and *State of Nebraska ex rel. Beck v. City of York,* 164 Neb. 223, 82 N. W. 2d 269. However, the Nebraska Constitution has been changed since the decision in the above case. See *State ex rel. Meyer v. County of Lancaster,* 173 Neb. 195, 113 N. W. 2d 63.

For the reasons stated, the mandamus prayed for is awarded.

*Mandamus awarded.*

---

(2) "§ 188. *Limit of tax or revenue.*—No other or greater amount of tax or revenue shall, at any time, be levied than may be required for the necessary expenses of the government, or to pay the indebtedness of the State."