# Richmond

## Industrial Development Authority of the City of Chesapeake v. Harold F. Suthers, Chairman, etc.

June 12, 1967.

Record No. 6589.

Present, All the Justices.

*Harry Frazier, III (Jack H. Spain, Jr.; Hunton, Williams, Gay, Powell and Gibson*, on brief), for petitioner.

*James M. Pickrell (James A. Johnson; Kellam and Kellam*, on brief), for respondent.

CARRICO, J., delivered the opinion of the court.

This original proceeding for a writ of mandamus (Code, § 17-96) brings under consideration the constitutionality of the Industrial Development and Revenue Bond Act and the validity of certain actions taken pursuant thereto.

The Act was adopted by the General Assembly at its 1966 session and is set out in Chapter 651, Acts of Assembly, 1966, p. 998 and in Code, §§ 15.1-1373 to 15.1-1390. (1964 Repl. Vol.)

The Act authorizes the governing body of any county, city, or town to create by ordinance an industrial development authority as a political subdivision of the Commonwealth with such public and corporate powers as are set forth in the Act to acquire, own, lease, and dispose of properties for the promotion of industry and the development of trade in such county, city, or town.

On September 13, 1966, the council of the city of Chesapeake adopted an ordinance creating the Industrial Development Authority of the City of Chesapeake, which we will hereafter call the Authority.

Following its creation, the Authority by assignment succeeded to the interest of the Chesapeake Port and Industrial Authority in an Interim Financing Agreement which had been entered into on May 25, 1966, between the Port Authority, Evans Products Company, the city, and the Virginia National Bank.

Evans, a Portland, Oregon, firm, early in 1966 indicated a desire to establish a manufacturing plant on the East Coast. Officials of Chesapeake encouraged Evans to locate in their city. Evans expressed a willingness to do so provided the Port Authority would acquire an acceptable site, construct thereon and equip a plant, and lease the facilities to Evans.

The cost of the project was proposed to be financed by revenue bonds to be issued by the Port Authority. However, bond counsel for the Port Authority would not approve the validity of the proposed bonds without a decision from this court supporting the Port Authority's power to issue the bonds.

Evans was unwilling to delay construction of the plant until completion of the litigation. Consequently, the Interim Financing Agreement was entered into under which it was agreed that the Virginia National Bank would lend the Port Authority $2,000,000 or more to finance the Evans project, that the Port Authority would repay the loan from the proceeds of the sale of tax exempt revenue bonds to be issued when approval was given therefor by bond counsel, and that Evans would guarantee payment of the loan if such bonds were not issued.

The assignment to the Authority of the Port Authority's interest in the Interim Financing Agreement was made pursuant to the provisions of the Agreement. After the assignment, the Authority borrowed funds from the Bank, purchased a suitable site, and undertook construction of the plant.

The Authority, by resolution, authorized the issuance of revenue bonds in the aggregate principal amount of $3,400,000 to be secured by an Indenture of Mortgage and Deed of Trust. Proceeds from the sale of the bonds were to be used to discharge all obligations incurred by the Authority to acquire land and to construct and equip the Evans plant. The Authority also authorized the execution of a lease of the project to Evans for a period of twenty-five years.

The Authority directed its chairman and its secretary, acting on its behalf, to execute and deliver the Indenture and the lease. The respondent in this proceeding, Harold F. Suthers, the chairman of the Authority, refused to execute the documents, posing seven questions challenging the constitutionality of the Industrial Development and Revenue Bond Act and the validity of certain of the actions of the Authority with regard to the Evans transaction. The Authority's petition for a writ of mandamus seeks the resolution of those questions and the award of a writ requiring the respondent to execute the documents in question.

In the recent case of *Development Authority* v. *Coyner*, 207 Va. 351, 150 S. E. 2d 87, we had before us the question of the constitutionality of Chapter 643, Acts of Assembly, 1964, p. 975. In that legislation, the General Assembly created industrial authorities for

the county of Fairfax and the cities of Virginia Beach and Danville. We upheld the financing of industrial development by the Fairfax Authority by the use of revenue bonds similar to those proposed to be issued by the Authority in this case.

The respondent contends, however, that there are substantial differences between the legislation creating the Fairfax Authority and the Act presently under review and that those differences render the Act unconstitutional. We turn now to the respondent's contentions.

## I.

[1] The respondent contends that the legislature unlawfully delegated its power when it authorized the local governing bodies to create industrial authorities as political subdivisions of the state, rather than to create such authorities itself, as it did in the case of the Fairfax Authority.

Such delegation of power, the respondent first says, is violative of § 154 of the Constitution, which provides that the creation of corporations and the amendment of corporate charters shall not be by special act but shall be provided for by general laws.

The respondent then argues that "a political subdivision such as that in issue here is in the nature of a municipal corporation" and that the Act "permits a municipality to create what amounts to a corporation by special act, in direct contravention of Section 154."

But § 154 does not apply to municipal corporations. The section is a part of Article XII of the Constitution entitled "Corporations." Section 153, another part of that article, provides that the term "corporation" as used in the article shall "exclude all municipal corporations." This court noted the clear exclusion of municipal corporations from the application of Article XII of the Constitution in the case of *Strawberry, Etc.* v. *Starbuck,* 124 Va. 71, 78, 97 S. E. 362.

Moreover, the prohibition of § 154 is against the creation of corporations by special act. The legislation before us is not a special act but a general law applicable throughout the state, conferring upon the governing body of "any county or incorporated city or town" the authority to exercise the powers thereby granted. (Code, §§ 15.1-1374, 1375, 1376.)

The respondent next says that the Act contravenes § 39 of the Constitution providing for the separation of the powers of government.

The respondent relies upon the case of *Carolina-Virginia Coast. H.*

v. *Coastal Turnpike Auth.*, 237 N. C. 52, 74 S. E. 2d 310, in which the North Carolina Supreme Court declared invalid an act of the legislature which vested in an administrative board the authority to determine whether construction of a toll highway or bridge would be in the public interest. The court held that the legislation was "violative of Article II, Section 1, of the State Constitution which inhibits the legislature from delegating its supreme legislative power to any other department or body." 74 S. E. 2d, at p. 318.

Here, we are not dealing with the delegation of power to a mere administrative agency foreign to the legislative process but to the local governing bodies which are a part of the legislative arm of the state. The legislature, in enacting the Act before us, has determined that the promotion of industry and the development of trade by industrial authorities are in the public interest. That determination is presumed to be correct. *Development Authority* v. *Coyner, supra,* 207 Va., at p. 351.

With the guidelines of public interest before them, the local governing bodies are empowered to determine when local conditions, with which they are far more familiar than is the legislature, warrant the creation of industrial authorities and then, by the adoption of ordinances, to trigger into effect the powers conferred upon such authorities by the General Assembly. There is no question that the council of the city of Chesapeake acted in the public interest when it created the Authority.

The same argument as is advanced here concerning the separation of the powers of government was advanced in the case of *Farquhar* v. *Board of Supervisors,* 196 Va. 54, 82 S. E. 2d 577, where we considered the constitutionality of the Virginia Water and Sewer Authorities Act (Code, §§ 15.1-1239 to 15.1-1270) under which the city of Alexandria, Virginia, Sanitation Authority had been created.

The Virginia Water and Sewer Authorities Act delegated to local governing bodies the power to create by ordinance sewer and other similar authorities. (Code, § 15.1-1241.)

In answer to the objection that such a delegation of power was unlawful because it was violative of the constitutional admonition that the legislative, executive, and judicial departments should be kept separate and distinct, we stated, "We see in the Act no breach of that injunction." 196 Va., at p. 70.

Respondent's final argument in support of his contention that there is an unlawful delegation of power involved in the Act is that the

type of organization in issue here may be created only by the General Assembly because § 147 of the Constitution provides that public welfare and other public and charitable institutions "shall be established and operated by the Commonwealth under such organization and in such manner as the General Assembly may prescribe."

The *Farquhar* case, *supra*, 196 Va. 54, affords full and direct answer to this argument. We noted there that the creation of the Alexandria Sanitation Authority was consistent with § 147 of the Constitution. The same may be said of the Authority here involved since it was created in the same manner, albeit under a different act of the legislature.

We find no constitutional restriction upon the delegation by the General Assembly to the local governing bodies of the power to create industrial authorities under the Act. In so finding, it might be well to note that § 65 of the Constitution expressly authorizes the General Assembly to confer upon local governing bodies "such powers of local and special legislation as it may, from time to time, deem expedient, not inconsistent with the limitations contained in this Constitution."

It might also be well to recall what this court said in *Danville* v. *Hatcher*, 101 Va. 523, 530, 44 S. E. 723:

"In the absence of constitutional restrictions, it is competent for the Legislature to confer its police power upon municipal corporations in such measure as it deems expedient. It cannot, of course, bestow greater power than the State itself possesses; and it must keep within the limitations, if any, imposed by the organic law. Subject to these restraints, it is within the province of the Legislature to invest such corporations with the police power of the State in whole or in part."

## II.

[2] The next three contentions of the respondent are based upon the same argument; and they will, therefore, be considered together.

The respondent argues that the Authority is but the alter ego of the city and is, therefore, subject to the same constitutional limitations as are imposed upon the city. That being so, the respondent says, the Act is rendered unconstitutional because it permits the Authority, acting in place of the city under a "device or pretense," to issue bonds without an election in violation of § 127 (b) of the Constitution; to grant the credit of the city to or in aid of a private corporation in violation of § 185; and to lease property of the city for

a term greater than thirty years and without receiving competitive bids therefor in violation of § 125.

We have no hesitancy in holding that the Authority is not the alter ego of the city or a "device or pretense" created to evade constitutional limitations. The Authority is a separate and distinct legal entity established to perform the public purpose designated by the legislature. It is independent of the city in its operations, its incurment of debt, and its ownership of property.

The revenue bonds proposed to be issued by the Authority will not be the bonds of the city, nor will the city thereby incur any indebtedness or grant its credit to or in aid of any private corporation.

Code, § 15.1-1379, a part of the Act, authorizes the Authority to issue revenue bonds from time to time in its discretion, without the consent of any other agency, for any of its purposes, including the payment of all or any part of the cost of its facilities. All bonds issued by the Authority are to be payable from the revenues and receipts derived from the lease or sale of its facilities.

Code, § 15.1-1382 provides that the Authority shall fix the rents, fees, and other charges to be paid for the use of its facilities and for any other services furnished or provided by the Authority. Such rents, fees, and charges shall be fixed so as to produce at least sufficient funds to pay the cost of maintaining, repairing, and operating such facilities and the principal and interest of any bonds issued by the Authority or other debts contracted as the same shall become due and payable.

Code, § 15.1-1380 declares what shall be the status of the bonds issued by the Authority and provides that such status shall be stated on the face of the bonds. The Code section provides that such bonds shall not be deemed to constitute a debt or a pledge of the faith and credit of the Commonwealth or of the city but shall be payable solely from the funds provided therefor as authorized by the Act.

Other portions of the Act further define the status of the bonds and the funds from which they shall be paid, the rights and duties of the Authority with respect to the bonds, and the rights of the holders of the bonds to enforce payment thereof. Code, §§ 15.1-1379, 1381, 1383, 1386.

From a reading of the Act, it is clear that there has been created a "special fund" providing the only means for payment of the bonds issued by the Authority. That fund is to be made up solely of the revenues and receipts derived from the lease or sale by the Authority

of its properties. It is equally clear that under such an arrangement the city does not, either directly or indirectly, issue any bonds, incur any indebtedness, or grant its credit to anyone. Thus, there is no violation of §§ 127 (b) and 185 of the Constitution. This conclusion is consistent with and supported by our earlier decisions in *Development Authority* v. *Coyner, supra,* 207 Va. 351, at p. 359; *Button* v. *Day,* 205 Va. 739, 743, 139 S. E. 2d 838; *Button* v. *Day,* 204 Va. 270, 273, 130 S. E. 2d 459; *Harrison* v. *Day,* 202 Va. 967, 977, 121 S. E. 2d 615; *Farquhar* v. *Board of Supervisors, supra,* 196 Va. 54, at pp. 68-69; *Almond* v. *Gilmer,* 188 Va. 822, 842-845, 51 S. E. 2d 272; and *Mumpower* v. *Housing Authority,* 176 Va. 426, 451-452, 11 S. E. 2d 732.

The cases of *Town of South Hill* v. *Allen,* 177 Va. 154, 12 S. E. 2d 770, and *Galax* v. *Appalachian E. P. Co.,* 177 Va. 29, 12 S. E. 2d 778, relied upon by the respondent to sustain his contention that the Act violates § 127 (b) of the Constitution, have no application here. In each of those cases, we held invalid bonds issued by the municipality itself as violative of the prohibition of § 127 (b) against the issuance of bonds by a municipality creating indebtedness in excess of its debt limitation without approval of the voters. Here, as has been stated, the city issues no bonds and incurs no indebtedness. Hence, the constitutional provision for an election to approve the issuance of bonds does not apply. *Farquhar* v. *Board of Supervisors, supra,* 196 Va., at pp. 59-62.

From what has been said, it should be plain that the Act does not violate § 125 of the Constitution, which prohibits the lease of the property of a city or town for a period greater than thirty years and requires that such lease shall be made only after competitive bids are received therefor. The property of the Authority is not the property of the city, and § 125 simply does not apply to the Authority.

### III.

[3] The respondent next contends that the Act is unconstitutional because it permits the issuance of bonds for a private purpose. He points to Code, § 15.1-1375 which states that it was the intent of the legislature by the passage of the Act to authorize the creation of industrial authorities so that such authorities may be able to promote industry and to develop trade by inducing industries to locate in "*or remain in*" this Commonwealth. The inclusion of the words "or remain in," says the respondent, permits the Authority to acquire an

existing facility and to lease it back to its former owner without any public benefit resulting therefrom.

What the respondent overlooks, however, is that the same Code section upon which he relies confines the Authority in the exercise of the powers conferred upon it to those situations which are "for the benefit of the inhabitants of the Commonwealth, for the increase of their commerce, and for the promotion of their safety, health, welfare, convenience and prosperity." Only if those elements are present in a proposed undertaking is the Authority authorized to act.

Public purpose may be as well served by inducing an industry whose continued existence is essential to the economy of a community to remain in this state as by inducing a new industry to enter. It is beside the point that some private interest may benefit incidentally from the action of an industrial authority in inducing an industry to remain in the state so long as such action promotes the "safety, health, welfare, convenience and prosperity" of the inhabitants of this Commonwealth. Code, § 15.1-1375; *Development Authority* v. *Coyner, supra*, 207 Va. 351, at p. 357.

The respondent argues that Evans is bound, under the terms of the Interim Financing Agreement, to remain in Virginia and to seek private financing of the project in the event it is determined that revenue bond financing is unattainable. This, says the respondent, converts the project into a private venture.

It is conceded by the pleadings, however, that what induced Evans to decide to locate in Virginia in the first place was the supposed availability of revenue bond financing, and it was only when the legality of such financing was questioned that the Interim Financing Agreement came into the picture to save what otherwise might have been a hopeless situation. Under the Agreement, the Authority is committed to provide revenue bond financing if it may legally do so. The public nature of the Authority's participation in the project is not destroyed, therefore, by the terms of the Agreement.

## IV.

[4] Although there is yet another attack made by the respondent upon the constitutionality of the Act, we will pass that for the time being and now consider the respondent's contention that he should not be required to execute the proposed Indenture because it illegally requires the payment from the proceeds of the sale of the Authority's bonds of certain costs incurred by Evans and the Virginia National

Bank in connection with the project. Payment of such costs, the petitioner says, is not authorized by the Act.

Code, § 15.1-1379 authorizes the Authority to issue bonds to pay "all or any part of the costs of authority facilities." Code, § 15.1-1374 (e) defines "cost" in general and specific language which, in our opinion, is sufficiently broad to include the disputed costs of Evans and the Bank in connection with the project. We find nothing illegal, therefore, about the Indenture in this respect.

## V.

[5] The final contention of the respondent is that Code, § 15.1-1382, a part of the Act, is unconstitutional and that Section 6.06 of the proposed lease between the Authority and Evans is, therefore, invalid.

Code, § 15.1-1382 provides that the Authority shall fix the rents, fees, and other charges which shall be paid for use of its facilities. The section further provides:

". . . Included in the rental payments to be made by any lessee to the authority shall be an amount in lieu of and equal to local property taxes and assessments upon property of the authority so leased; provided, however, that all such taxes and assessments shall be remitted by the authority to the political subdivision to which such taxes would normally be remitted if the property were owned by private persons and not by the authority and shall be remitted by the authority to the political subdivision at the same time and into the same fund or funds as are local property taxes. Notwithstanding anything contained herein to the contrary, the authority and the political subdivision in which all or any part of the property for a particular facility of the authority is located may agree at any time to a definite sum to be paid as local property taxes and assessments throughout the duration of the lease of a particular project. . . ."

Section 6.06 of the lease provides, pursuant to Code, § 15.1-1382, for the payment by Evans as additional rent of a sum in lieu of taxes and assessments.

These statutory and lease provisions, the respondent argues, are contrary to § 183 of the Constitution providing for the exemption from taxation of only certain specified property and to § 168 requiring that "all taxes, whether State, local or municipal, shall be uniform

upon the same class of subjects within the territorial limits of the authority levying the tax, and shall be levied and collected under general law."

The respondent concedes that property owned by the Authority is exempt from taxation under the provisions of § 183. He says, however, that the leasehold interest of Evans is subject to taxation under Code, § 58-758. See *Shaia* v. *City of Richmond*, 207 Va. 885, 153 S. E. 2d 257. The respondent then argues that Code, § 15.1-1382 and the lease permit the parties to agree to the payment of a leasehold interest tax by Evans which might not equal the proper amount or which might be less than another lessee similarly situated might be required to pay, thus resulting in a lack of uniformity or in no taxation at all.

We must agree with the respondent that the portion of Code, § 15.1-1382 providing for the payment of a fixed sum in lieu of taxes is unconstitutional and that Section 6.06 of the lease is invalid.

[6] Code, § 15.1-1382 has the effect of exempting the lessee of industrial authority property from the payment of a leasehold interest tax imposed pursuant to Code, § 58-758. The case of *Shaia* v. *City of Richmond, supra,* makes it clear that neither such a lessee nor such a leasehold interest is exempted from taxation by § 183 of the Constitution. 207 Va., at p. 890.

Code, § 15.1-1382 has the further effect of permitting taxation by agreement rather than by the levy and collection of taxes under general law as required by § 168 of the Constitution.

Finally, Code, § 15.1-1382 has the effect of permitting non-uniformity of taxation in violation of § 168, not only as between lessees of industrial authority property in a municipality but also as between lessees of such property and lessees of other tax exempt property. That is so because the amount of the fixed sum to be paid by lessees of industrial authority property, although required by the statute to be "equal to local property taxes and assessments," is to be the subject of negotiation between the interested parties.

As between the various lessees of industrial authority property similarly situated, the amount of the fixed sum may vary as the abilities of the negotiators vary. And, as between such lessees and those leasing other tax exempt property, the former are granted the right to negotiate the fixed sum to be paid in lieu of taxes while the latter are granted no such right but are left to the mercy of the assessing authorities.

In *Whiting & Als.* v. *Town of West Point*, 88 Va. 905, 14 S. E. 698, a case not cited to us by either party to this litigation, this court held unconstitutional an ordinance which exempted a railroad company from the payment of local taxes upon its property as long as it maintained its principal Virginia office in the town. The opinion cites the case of *State* v. *Hannibal & St. J. R. Co.*, 75 Mo. 208. In the Missouri case, the city of Hannibal contracted with a railroad company to exempt its property from city taxation in consideration of the annual payment by the railroad of $700. The Missouri court held the contract invalid. This court noted with approval one of the grounds for holding that the contract was not valid. That ground applies here. Our opinion states:

". . . [T]he idea of taxation imports equality of apportionment. . . [I]t is this which distinguishes taxation from arbitrary exaction. . . [T]he exemption of the property of one person casts an inequitable burden upon others not thus graciously favored." 88 Va., at p. 908.

See also *Bristol* v. *Dominion Nat. Bank*, 153 Va. 71, 78, 149 S. E. 632; *City of Richmond* v. *Va. R. & P. Co.*, 124 Va. 529, 542-543, 98 S. E. 691.

The respondent cannot be required to sign the lease because it contains a void provision. Nor can he be required to sign the Indenture because it is contingent upon the execution of a valid lease. The writ of mandamus will, therefore, be denied.

*Mandamus denied.*