PRESENT: All the Justices

INTERNATIONAL PAPER COMPANY

v.  Record No. 190542

COUNTY OF ISLE OF WIGHT

OPINION BY
JUSTICE S. BERNARD GOODWYN
September 17, 2020

FROM THE CIRCUIT COURT OF ISLE OF WIGHT COUNTY
Carl E. Eason Jr., Judge

In this appeal, we consider whether the circuit court erred in granting a county's motion to strike a taxpayer's application for correction of a machinery and tools tax assessment that the taxpayer claimed was non-uniform, invalid, and illegal.

I. BACKGROUND

International Paper Company (International Paper) is a New York-based corporation that owns a paper production facility in Isle of Wight County (the County). The paper facility, which was repurposed and reopened in June 2012, after being idled in 2010, utilizes paper-making machinery for its manufacturing operations.

Between tax years 2012 and 2015,[1] the County levied a machinery and tools (M&T) tax on all businesses or persons owning qualifying machinery in the County, including International Paper. During those tax years, the County Board of Supervisors (the Board) passed ordinances which set the M&T tax rate at $0.70 per $100 of assessed value. The Commissioner of the Revenue of the County, Gerald Gwaltney (Commissioner Gwaltney), assessed all M&T property

---

[1] The County's M&T tax year runs between July 1 and June 30. For instance, the 2012 tax year runs from July 1, 2012, to June 30, 2013. All references to tax years in this opinion correlate with such dates for the M&T tax year.

at 100% of its original total capitalized cost in each of those years.[2] International Paper paid the M&T taxes assessed by the County in those tax years.

International Paper had discussions with Commissioner Gwaltney concerning the assessed value of its paper machinery, and it subsequently hired an independent appraiser to value its M&T property. The appraiser determined that the fair market value of International Paper's paper machinery was approximately 60% of the County's valuations.

A. International Paper Challenges Tax Assessments for Tax Years 2012–14

On December 29, 2014, International Paper filed an application for a correction of erroneous assessments for tax years 2012–14 (the First Refund Action) in the Circuit Court of Isle of Wight County. On March 15, 2017, after holding a trial, the circuit court entered final judgment in favor of International Paper in the First Refund Action. The circuit court held that the County's M&T tax assessment methodology was "clearly erroneous" because it valued International Paper's M&T property above fair market value. The circuit court ruled that the County owed International Paper approximately $2.4 million in tax refunds, plus interest, for tax years 2012–14.

The County subsequently petitioned this Court regarding an appeal of the judgment in the First Refund Action concerning the 2012 tax year; the petition was refused in an October 27, 2017 order. By November 1, 2017, the County had tendered full payment to International Paper and satisfied the judgment entered in the First Refund Action.

On October 3, 2016, during the pendency of the First Refund Action and after the County had retained an expert who concluded that the County's assessment of M&T property at 100% of

---

[2] Code § 58.1-3507(B) requires M&T property to be valued "by means of depreciated cost or a percentage or percentages of original total capitalized cost excluding capitalized interest."

its original capitalized cost resulted in valuations of M&T property in excess of fair market value, Commissioner Gwaltney, after public notice, changed the valuation methodology of M&T property in the County from 100% of original capitalized cost to 40% of original capitalized cost for M&T tax year 2016. He recommended that the Board adopt an amended M&T tax rate of $1.75 per $100 of assessed value for M&T tax year 2016, in order to make the change to the 2016 M&T property valuations revenue neutral.

On October 20, 2016, the Board passed an ordinance increasing the M&T tax rate from $0.70 per $100 of assessed value to $1.75 per $100 of assessed value, for M&T tax year 2016. The ordinance noted that the increase was necessary for the County's revenues generated from the M&T tax to "remain neutral for the 2016 tax year," in light of Commissioner Gwaltney's reduction of the assessed value of M&T property in the County.

B.  The County Retroactively Corrects 2013–15 Assessments for All M&T Taxpayers

In December 2016, Commissioner Gwaltney sent letters to M&T taxpayers in the County conceding that their M&T property valuations for tax years 2013–15 had been above fair market value. He also informed them that the valuations for those tax years would be retroactively reduced and tax refunds would be voluntarily issued because of the overpayments the County had received from the M&T taxpayers as a result of the improper valuations. The County subsequently issued tax refunds, based on a revised assessment of the M&T property values at 60% of original capitalized cost, rather than the 100% of capitalized cost at which it was previously assessed and taxed, for the 2013, 2014, and 2015 M&T tax years. The correction of

the assessments resulted in the issuance, by the County, of refunds which totaled approximately $5.6 million.[3]

Along with their refund checks, M&T taxpayers also received a letter from the County Administrator dated January 6, 2017, in which the administrator stated:

> The amount of the refunds was not anticipated in this year's Operating Budget and will create a potential deficit that the board is now taking steps to address. One of the anticipated steps is an increase in the M&T tax rate for the County's fiscal year 2017-18 budget. The adjustment will only be for tax year 2017.
> We have estimated that any tax increase over the current tax amount will be very close to the amount of the refund you have just received.

### C. The County Increases the M&T Tax Rate for Tax Year 2017 and Implements Tax Relief Program

The Board, being informed that well over five million dollars and a significant percentage of the County's general fund had to be expended because of the past M&T valuation error, sought to replenish its general fund to avoid the negative fiscal impacts caused by the required payment of the M&T tax refunds. At a Board meeting on January 5, 2017, Commissioner Gwaltney advised the Board that it should substantially raise the M&T tax rate to replenish funds from the general fund used to pay the M&T tax refunds. He suggested that the increased tax rate be in place for only one year and explained that the increased tax rate he proposed was set to an amount sufficient to allow the tax increase to be accompanied by some type of payment program for M&T taxpayers to "offset any net increase" in M&T tax assessments, above the amount of the M&T tax refund the M&T taxpayer had received.

The Board followed Commissioner Gwaltney's suggestion regarding the M&T tax plan for tax year 2017. On May 11, 2017, the Board passed an ordinance increasing the M&T tax rate

---

[3] This refund expenditure total includes the amounts paid to International Paper for the judgment it was awarded in the First Refund Action for M&T tax years 2013–14.

to $4.24 per $100 of assessed value for tax year 2017.  Then, on June 15, 2017, the Board passed

a resolution authorizing an economic development retention grant program (the M&T Tax Relief

Program) to benefit certain M&T taxpayers.  That resolution states, in pertinent part:

> WHEREAS, in cooperation with the Board of Supervisors, the Commissioner of the Revenue adjusted the County's M&T tax assessments for multiple tax years and made appropriate adjustments of tax amounts for prior years including 2016; and,
>
> WHEREAS, in an effort to mitigate the impact on County revenues resulting from the adjustment to M&T taxes, *the Board of Supervisors adopted a [] one-year adjustment to the machinery and tools tax rate for FY2017-18 with the intent that any businesses negatively impacted by the adjustment would be eligible for an Economic Development Retention Grant.*
>
> NOW, THEREFORE, BE IT AND IT IS HEREBY RESOLVED that the Board of Supervisors of the County of Isle of Wight, Virginia authorizes the issuance of Economic Development Retention Grants in the cumulative amount of [$32,125] to businesses *negatively impacted by the adjustment to the M&T tax.*

In a July 17, 2017 meeting, the Board passed a resolution to amend its operating and

capital budgets, which states, in relevant part:

> BE IT FURTHER RESOLVED that machinery and tools tax revenues in the amount of $5,149,571 be appropriated to the FY2017-18 General Fund Non-Departmental Reserves – Fund Balance.
>
> BE IT FURTHER RESOLVED that machinery and tools tax revenues in the amount of $1,164,274 be appropriated to the FY2017-18 General Fund Operating Budget to provide Economic Development Incentive Grants.

The Board thus funded the M&T Tax Relief Program with the $32,125 in appropriations and

approximately $1.1 million which would be raised from the increased 2017 M&T tax.

The County distributed the M&T Tax Relief Program "grants" by automatically crediting

the M&T relief amounts on taxpayers' M&T tax bills.  All M&T taxpayers were eligible to

receive a credit against the amount of their 2017 M&T tax assessment equal to the amount that

their M&T taxes increased because of the higher 2017 tax rate (the difference between the

amount owed under the then current $4.24 rate per $100 of assessed value, minus the amount

5

that would have been owed under the 2016 M&T tax rate of $1.75 per $100 of assessed value), reduced by the refund amounts for M&T tax years 2013–15 received by the taxpayer. This resulted in only the taxpayers who received refunds having to pay the substantially increased M&T tax rate, with the increased amount owed by them being limited to the amount of the M&T tax refund they had received from the County.

As expressed by the Board, "any business negatively impacted by the adjustment" received an M&T Tax Relief Program "grant," which prevented those negatively impacted from being burdened by the tax increase. The payment by an M&T taxpayer, of an amount up to the amount of the M&T tax refund the taxpayer received from the County, was not considered by the County to negatively impact that taxpayer.

For tax year 2017, International Paper's M&T property was assessed at a value of $139,386,552. Application of the tax rate of $4.24 per $100 of assessed value and application of the M&T Tax Relief Program formula resulted in International Paper receiving an M&T tax bill from the County which stated that it owed the County $5,485,481.82 in M&T taxes for tax year 2017. International Paper timely paid the amount it was billed for its 2017 M&T taxes, and subsequently filed an application to correct its assessment.

D. International Paper Challenges its 2017 M&T Tax Assessment

On May 24, 2018, International Paper filed an application, pursuant to Code § 58.1-3984,[4] for a correction of the County's "nonuniform, invalid & illegal" assessment of International Paper's M&T taxes for tax year 2017 (the Second Refund Action) in the Circuit Court of Isle of Wight County. The Second Refund Action had five counts, which asserted

_____

[4] Code § 58.1-3984(A) permits a taxpayer to seek a correction of its tax assessment if its taxable property was "valued at more than its fair market value or that the assessment is not uniform in its application, or that the assessment is otherwise invalid or illegal."

6

violations of: International Paper's vested right in the judgment it obtained in the First Refund Action (Count 1), separation of powers (Count 2), the County's statutory grant of legislative authority (Count 3), tax uniformity required by Va. Const. art. X, § 1 (Count 4), and the established classes of taxable property subject to uniformity pursuant to Va. Const. art. X, § 1 and Code § 58.1-3507(A) (Count 5). In its prayer for relief, International Paper requested that the circuit court find its 2017 M&T tax assessment to be ultra vires, erroneous, not uniform in its application, invalid, and illegal and that the 2017 M&T taxes paid by International Paper be ordered refunded.

On November 19, 2018, International Paper filed a pretrial memorandum. International Paper argued that the County's 2017 M&T tax plan (the increased M&T tax rate and the M&T Tax Relief Program)—which International Paper referred to as a "Refund Clawback Ordinance"—violated International Paper's vested right to its judgment in the First Refund Action. It further contended that the County's actions violated separation of powers because the County cannot indirectly nullify a court judgment. It also argued that the County's 2017 M&T tax plan resulted in the County "clawing back the precise amount" of tax refunds that International Paper received from the County pursuant to the judgment in the First Refund Action for tax years 2013–14 and the County's administrative refund for tax year 2015. Finally, International Paper contended that the 2017 M&T tax plan resulted in varying "effective rates" among M&T taxpayers, which violated uniformity.

The County submitted a pretrial memorandum on the same date. It argued that it had authority to tax M&T property and to raise the M&T tax rate. It also contended that the uniformity requirement does not apply to the outcome of a tax bill and that every M&T taxpayer was subject to the same valuation method and tax rate. It argued that M&T Tax Relief Program

7

payments should not be considered in determining an "effective tax rate" because the grants from such a program are not part of the tax process and not relevant to the challenge of an "assessment" pursuant to Code § 58.1-3984. Further, the County asserted that, even if the net amount owed for M&T taxes after application of M&T Tax Relief Program payments is within the meaning of "assessment," the M&T Tax Relief Program was uniformly applied.

### E. Trial of the Second Refund Action

The circuit court held a bench trial on the Second Refund Action from November 26 to November 28, 2018. International Paper offered into evidence documentation supporting the facts as stated above.[5] Additionally, International Paper offered two spreadsheets that showed the County's assessed values of M&T property, M&T Tax Relief Program payment amounts, and 2017 M&T tax bills for all M&T taxpayers in the County.

International Paper also presented a video deposition of Mark Popovich (Popovich), who was the County Attorney at the time of the deposition. Popovich testified that the M&T Tax

---

[5] At trial, International Paper offered other evidence and testimony to demonstrate Commissioner Gwaltney's animus towards International Paper as a motive behind the 2017 M&T tax plan. On appeal to this Court, the County contends that we should not consider such evidence. Similarly, in a brief amicus curiae, the Local Government Attorneys of Virginia, Inc. and the Virginia Association of Counties argue against judicial inquiry into the motivations behind the County's actions.

We "are not concerned with the motives which actuate members of a legislative body in enacting a law, but in the results of their action." *W.S. Carnes, Inc. v. Board of Supervisors of Chesterfield Cty.*, 252 Va. 377, 385 (1996). "Collateral purposes or motives of a legislature in levying a tax of a kind within the reach of its lawful powers are matters beyond the scope of judicial inquiry." *City of Fredericksburg v. Sanitary Grocery Co.*, 168 Va. 57, 68 (1937) (citation and internal quotation marks omitted).

Accordingly, we do not recite, and do not consider, International Paper's evidence purporting to demonstrate the motives behind the 2017 M&T tax plan as indicative of an animus towards International Paper, other than as context for the factual background of this case. We will only consider, as probative of legislative intent, the purposes of the disputed legislation as stated in the applicable ordinances and resolutions and the effects of such legislation.

8

Relief Program was designed to ensure that M&T-owning businesses did not leave the County, and he stated that the M&T Tax Relief Program was a one-time, "unique, [and] specific situation," which the County had not done previously.

He testified that the County's general fund provided the funds for the M&T Tax Relief Program. He stated that the M&T tax revenue from the 2017 M&T tax was assigned to the County's general fund, but such revenue subsequently became a "restricted" amount dedicated to the M&T Tax Relief Program.

Popovich also explained how the County calculated the M&T Tax Relief Program payment amounts. According to Popovich, the County first calculated each taxpayer's potential 2017 M&T tax liability using the rate of $4.24 per $100 of assessed value, which was the County's stated M&T tax rate for 2017 (initial 2017 M&T tax calculation). The County then calculated what each taxpayer's liability would be under the 2016 M&T tax rate of $1.75 per $100 of assessed value (hypothetical 2016 M&T tax calculation). The County subtracted the hypothetical 2016 M&T tax calculation from the initial 2017 M&T tax calculation, in order to determine the net increase the M&T taxpayer faced because of the 2017 increase in the tax rate (net tax increase). Popovich testified that the County then subtracted the M&T tax refund amount the taxpayer received for M&T tax years 2013–15 from the amount of the net tax increase to determine the amount of the relief granted to the M&T taxpayer, pursuant to the M&T Tax Relief Program.

If the M&T Tax Relief Program formula produced a negative amount of tax relief—because the amount of the tax increase was less than the refund which had been received—the taxpayer did not receive any M&T tax relief. If the amount was a positive number, the County

9

would automatically deduct that relief amount from the M&T taxpayer's initial 2017 M&T tax calculation, which had been calculated by using the $4.24 tax rate.

Popovich explained that the County gave relief payments to any M&T taxpayer who experienced a net M&T tax increase that was greater than the amount of the M&T tax refund the taxpayer had received for tax years 2013–15. Popovich testified that, for any M&T taxpayer who did not receive a tax refund for tax years 2013–15, the amount that such taxpayer paid—after subtracting the M&T tax relief amount—would be the same amount as if there had been no increase of the M&T tax rate in 2017.

Popovich further testified as to how International Paper's 2017 M&T tax bill was calculated. According to Popovich, the County valued International Paper's M&T property at $139,386,552 for tax year 2017. Under the applicable $4.24 rate, International Paper's initial 2017 tax calculation was $5,909,989. Under the $1.75 rate, International Paper's hypothetical 2016 M&T tax calculation was $2,439,264. Thus, International Paper's net M&T tax increase from tax years 2016 to 2017 was calculated to be $3,470,725 ($5,909,989 minus $2,439,264). The County paid International Paper tax refunds totaling approximately $3,046,217 for M&T tax overpayments during tax years 2013–15.[6] Subtracting the refund amount, $3,046,217, from the net increase amount, $3,470,725, reduced the amount of M&T tax relief due to International Paper, and yielded a relief payment amount of $424,508 (net tax increase ($3,470,725) minus tax

_____

[6] This refund amount represents the County's overassessments of International Paper's M&T property for tax years 2013–15, which includes, in part, the amount the County owed International Paper pursuant to the judgment in the First Refund Action, which challenged assessments for tax years 2012–14. The First Refund Action did not challenge International Paper's M&T tax in 2015, which Commissioner Gwaltney administratively refunded, pursuant to Code § 58.1-3981(A) ("If the commissioner of the revenue, or other official performing the duties imposed on commissioners of the revenue under this title, is satisfied that he has erroneously assessed such applicant with any such tax, he shall correct such assessment.").

10

refunds received ($3,046,217) equals the amount of M&T tax relief ($424,508)).  International Paper thus received a net 2017 M&T tax bill of $5,485,481 (initial 2017 M&T tax calculation ($5,909,989) minus M&T tax relief amount ($424,508) equals the amount of M&T tax owed ($5,485,481)).  The County did such a calculation for every M&T taxpayer to determine the amount each owed the County for 2017 M&T taxes.

Commissioner Gwaltney testified that the County had approximately 100 M&T taxpayer accounts in tax year 2017.  He stated that, in proposing the $4.24 M&T tax rate accompanied by the M&T Tax Relief Program to the Board, he sought to close the budget gap caused by the issuance of the tax refunds for tax years 2013–15, while also ensuring that no M&T taxpayer "would be harmed" by having to pay any more than they had received in refunds, because of the increased tax rates.  He stated the relief was provided to encourage M&T-owning businesses to stay in the County despite the one-year tax increase.

Thomas Elder, Jr., (Elder) testified that he manages the County's economic development office, which promotes and seeks to retain businesses in the County.  He stated that his office has previously issued economic stimulus payments, but that his office was not involved with the design and implementation of the M&T Tax Relief Program.

The circuit court also certified Guy Davis (Davis) as an expert in forensic accounting and financial investigations.  Davis testified that the 2017 M&T tax plan accomplished the County's M&T tax funding goals; it was part of the County's 2017 "tax strategy."  He stated that the 2017 M&T tax plan's two components, the 2017 M&T tax increase and the M&T Tax Relief Program, "were implemented for [the 2017 M&T tax] year, and they both expired at the end of that year." He testified that the 2017 M&T tax plan created disparate tax rates among M&T taxpayers. Davis opined that 39 M&T taxpayer accounts paid M&T taxes according to the $4.24 rate, 28

accounts paid according to a $1.75 rate, and 33 accounts paid according to a rate somewhere between the $4.24 and $1.75 rates. As an example, he stated that International Paper paid a tax rate of $3.94 per $100 of assessed value of its M&T property, while another M&T taxpayer, Cashin Systems, paid a rate of $2.76 per $100 of assessed value.

Davis testified that the "main driver" behind the disparate tax rates was the M&T Tax Relief Program aspect of the 2017 M&T tax plan. Davis testified that the 2017 M&T tax plan ensured that no M&T taxpayer was going to pay more because of the increased tax rate than the taxpayer received in a refund for tax years 2013–15. Davis also opined that the County's 2017 M&T tax plan "resulted in a 100 percent recovery of the refunds that were paid" for tax years 2013–15. The tax plan allowed the County to retain the amount of M&T tax revenue desired to close the hole in the County's budget caused by the tax refunds. Davis noted that "neither . . . the refund that was paid, nor the incremental [M&T] tax that was changed was included as a budgeted revenue or a budgeted disbursement."

At the conclusion of International Paper's evidence, the County moved to strike International Paper's evidence and claims. The County argued that International Paper's claims were not within the scope of challenging an "assessment" pursuant to Code § 58.1-3984, because International Paper's claims do not challenge the "levy or . . . the assessed value" of M&T property. It asserted that International Paper challenged the 2017 M&T tax rate increase and the M&T Tax Relief Program, neither of which are the "levy" or "assessed value" of M&T property.

The County also argued that the intention behind the 2017 M&T tax rate was to "fill the hole in the general fund" caused by the $5.6 million paid out in M&T tax refunds for tax years 2013–15. It contended that the automatic offset of the 2017 M&T tax bills by the amount of the "grants" from the M&T Tax Relief Program represented "just math." It asserted that "a grant is

12

a grant. And why do we know it's a grant? Because the [B]oard called it that" and grants are not a part of the taxation process.

International Paper argued that they presented evidence demonstrating the factual existence of varying "effective tax rate[s]" for M&T property taxed by the County. It also contended that the 2017 M&T tax plan had the "purpose and effect" of clawing back its judgment awarded in the First Refund Action, in violation of International Paper's vested right to that award and in violation of the separation of powers.

It also asserted that its claims were "as-applied" challenges, and therefore the circuit court needed to examine the "actual effect" of the 2017 M&T tax plan on it, as an M&T taxpayer. It argued that the County's 2017 M&T tax plan had the "effect" of causing non-uniformity in M&T taxation in the County by creating disparate tax rates among M&T taxpayers. It asserted that M&T taxpayers who did not receive a tax refund for tax years 2013–15, for instance, paid an effective rate of $1.75 per $100 of assessed value, while those who received refunds paid higher tax rates. It further contended that such disparate tax rates effectively created a sub-class of M&T taxpayers. It argued that the M&T Tax Relief Program payments were "on the tax side," and that the 2017 M&T tax plan "produce[d] nonuniformity."

The circuit court granted the County's motion to strike from the bench. On January 29, 2019, the circuit court entered a final order consistent with its ruling from the bench. Regarding vested rights, the circuit court explained that the 2017 M&T tax rate was a "new tax" and that "new taxes are required to be paid" and do not violate a taxpayer's vested rights to a prior judgment regarding a different tax. Regarding separation of powers, the circuit court noted that the Board is "answerable to the electorate" concerning the 2017 M&T tax plan and thus, there was no violation of the separation of powers.

13

Regarding uniformity, the court held that an "effective tax rate" is not relevant because any tax deduction can result in an "effective tax rate" differential. It therefore concluded that the 2017 M&T tax rate and tax assessments were uniform notwithstanding the M&T Tax Relief Program. The court also found that the "purpose and effect" of the 2017 M&T tax plan was to cover the County's budget deficit created by the County's tax refunds for prior tax years and to ensure that no M&T taxpayers paid more than their entitled refund toward closing that budget deficit. Accordingly, the circuit court dismissed the Second Refund Action, with prejudice.

International Paper appeals. We granted four assignments of error:

1. The trial court erred in holding that IP had not made a prima facie case on Counts I, II, or III, in striking and dismissing those Counts, and in relying upon the conclusion that "new taxes are required to be paid to governmental bodies," and are generally "political decisions." Isle of Wight's imposition of a tax increase upon IP's M&T, which was the subject of court-ordered and legally mandated refunds and was imposed after IP's special damages had vested, with the purpose and effect of exacting precisely the refund amount in additional taxes, presented a prima facie case on each of these counts.

2. The trial court erred in holding that IP had not made a prima facie case on Counts IV or V, in striking and dismissing them, and in concluding that "there can [legally] be an 'effective tax rate' that is different than the imposed or statutorily established tax rate" for M&T. Isle of Wight's adoption and application, without statutory authority, of a "credit" against direct tax liability, resulting in disparate direct tax burdens upon one class, including upon IP's M&T, presented a prima facie case on both of these counts.

3. The trial court erred as a matter of law in determining the purposes of the Clawback Ordinance and Clawback Credit without regard to their effects on taxpayers, and in finding a shortfall in the general fund. On a motion to strike, the trial court must evaluate legislative purpose by its natural effect, decide no disputes of material fact, view the evidence, with all reasonable inferences drawn, in IP's favor, to determine only whether a prima facie case exists.

4. The trial court erred as a matter of law in relying upon its findings of Isle of Wight's purposes for the Clawback Ordinance and Clawback Credit to grant the motion to strike IP's case-in-chief. Legitimate governmental purposes will not immunize legislative, administrative or executive acts from violating the Virginia Constitution or exceeding statutory power, as applied.

14

## II. ANALYSIS

At the conclusion of the plaintiff's evidence, a circuit court should grant a defendant's motion to strike only where "it is conclusively apparent that plaintiff has proven no cause of action against [the] defendant." *Brown v. Koulizakis*, 229 Va. 524, 531 (1985). On appeal of a motion to strike, this Court views the evidence in the light most favorable to the plaintiff. *Howell v. Sobhan*, 278 Va. 278, 280 (2009). "If several inferences may be drawn from the evidence . . . we adopt those most favorable to the plaintiff unless they are strained and forced or contrary to reason." *Id.* (citation and internal quotation marks omitted).

To the extent that International Paper's claims challenge the constitutionality of the 2017 M&T tax plan, we review such constitutional questions de novo. *Dulles Duty Free, LLC v. County of Loudoun*, 294 Va. 9, 13 (2017). "We accord every legislative act a presumption of constitutionality. A party which alleges [legislation] is being unconstitutionally applied bears the burden of proving that the [legislation] is unconstitutional under a particular set of facts." *Id.* at 13–14 (addressing a constitutional as-applied challenge); *see also City of Waynesboro v. Keiser*, 213 Va. 229, 233 (1972) (explaining that the burden was on the taxpayer to overcome the presumption in favor of the validity of a city's application of assessments to comparable properties for lack of uniformity).

In Counts 1–3 of its complaint, International Paper claims that the 2017 M&T tax plan adopted by the County was "invalid or illegal" because it violated International Paper's vested rights, the separation of powers doctrine, and was executed without statutory authority. International Paper argues that the circuit court erred in striking Counts 1, 2, and 3 because its evidence established that the County's 2017 M&T tax plan "had the operation and effect, and so

15

purpose, of clawing back legally required refunds, impairing vested rights, breaching the separation of powers, and exceeding the statutory power to tax M&T."

We address each of those claims, in turn.

### A. Vested Rights

International Paper argues that the circuit court erred in sustaining the motion to strike as to Count 1, its vested rights claim. It asserts that it has a vested property interest in the judgment it was awarded in the First Refund Action, and that the 2017 M&T tax plan violated that vested interest by clawing back the payments on the "old taxes" that the County was required to refund pursuant to the judgment awarded to International Paper.

The County argues that it did not interfere with International Paper's vested rights to its judgment because the County fully satisfied the judgment from the First Refund Action when it paid International Paper the amount owed pursuant to that judgment. Also, the County asserts that it had the authority to increase the rate of taxation on M&T property in 2017.

A vested right is a "right, so fixed that it is not dependent on any future act, contingency or decision to make it more secure." *City of Norfolk v. Stephenson*, 185 Va. 305, 314 (1946) (citation and internal quotation marks omitted). "It is not within the power of a legislature to take away rights which have been once vested by a judgment." *Morency v. Commonwealth*, 274 Va. 569, 574 (2007) (citation and internal quotation marks omitted). "Accordingly, once a plaintiff acquires such a vested right, it cannot be disturbed by the subsequent repeal of the statute under which it was obtained." *Id*. In other words, "a judgment at law is immune to subsequent changes in the law." *Id*. (citation and internal quotation marks omitted).

International Paper had a vested right to the judgment it was awarded in the First Refund Action. As of November 1, 2017, the County had tendered full payment of the tax refunds it

owed International Paper for tax years 2012–14 pursuant to the judgment from the First Refund Action.

The County had the authority to increase the M&T tax rate. *See* Va. Const. art. X, § 4; Code § 58.1-3507(A). The 2017 M&T tax increase did not retroactively alter the M&T tax rates for tax years 2012–14, and it did not interfere with the First Refund Action judgment, which the County had already paid.

Although the 2017 M&T tax plan may have "clawed back" the money the County paid International Paper pursuant to the First Refund Action, the tax increase and relief program did not interfere with International Paper's vested right to its judgment. International Paper has been paid the money it had a vested right to receive. The circuit court did not err in sustaining the motion to strike as to Count 1.

### B. Separation of Powers

International Paper argues that the circuit court erred in granting the motion to strike as to Count 2, its separation of powers claim. It contends that the 2017 M&T tax rate increase violated its vested right in the judgment award from the First Refund Action, which was an "invasion of judicial authority."

The County argues that it had the authority to raise M&T property taxes to accomplish the legitimate government purpose of restoring the County's general funds depleted by the M&T tax refunds that the County paid. It contends that the 2017 M&T tax rate increase was a legislative and political decision not subject to judicial intervention.

Article I, Section 5 of the Constitution of Virginia provides, in relevant part: "That the legislative, executive, and judicial departments of the Commonwealth should be separate and

17

distinct." *See also Gray v. Virginia Sec'y of Transp.*, 276 Va. 93, 105 (2008) (holding that this provision is self-executing).

> The Virginia Constitution directs that the government function through three equal but separate branches with specific responsibilities and powers assigned to each, and that no one branch may exercise the functions or powers of another except as specifically authorized by the constitution.

*Taylor v. Worrell Enters., Inc.*, 242 Va. 219, 221 (1991) (emphasis added).

This Court has acknowledged, however, that separation of powers "is not absolute and necessarily operates within some practical limitations and exceptions." *Id.* "There will [] be instances where the line between the powers of two branches may be less than clear and incidental encroachment is necessary and permitted." *Id.* at 221–22.

Article X, Section 4 of the Constitution of Virginia provides that "tangible personal property" is subject to "local taxation only, and shall be assessed for local taxation in such manner and at such times as the General Assembly may prescribe by general law." The General Assembly has accordingly passed Code § 58.1-3507(A), which provides that "[m]achinery and tools," with some exceptions, "shall be subject to local taxation only" and that the M&T tax rate "shall not exceed the rate imposed upon the general class of tangible personal property."

The circuit court did not err in sustaining the motion to strike as to Count 2. The Constitution of Virginia has given localities, such as the County, the express authority to tax tangible personal property, which, under Code § 58.1-3507(A), includes M&T property. International Paper did not allege, nor argue, that the 2017 M&T tax rate "exceed[ed] the rate imposed upon the general class of tangible personal property." The County therefore had the constitutional and statutory authority to implement the 2017 M&T tax rate increase.

Additionally, as aforementioned, the 2017 M&T tax rate increase did not invade the judicial branch's authority because the rate increase did not void the First Refund Action final

18

order, nor change the M&T tax rates applicable in tax years 2012–14, which were the bases for the First Refund Action judgment.  In short, the County was not acting judicially, but was executing its legislative authority when it increased the M&T tax rate for the 2017 M&T tax year.  The circuit court therefore did not err in striking Count 2.

## C.  Authority to Act

International Paper argues that the circuit court erred in granting the motion to strike as to Count 3.  It contends that the 2017 M&T tax plan was ultra vires because it indirectly and retroactively revised International Paper's M&T valuations and tax rates for tax years 2013–15.

The County contends that it had the authority to tax M&T property under Code § 58.1-3507 and to execute the M&T Tax Relief Program under Code §§ 15.2-940 and -950.

"The Dillon Rule of strict construction controls our determination of the powers of local governing bodies."  *Bragg Hill Corp. v. City of Fredericksburg*, 297 Va. 566, 578 (2019) (citation and internal quotation marks omitted).  "Municipalities have only those powers that are (1) expressly granted by the General Assembly, (2) necessarily or fairly implied from those express powers, and (3) essential to the declared objects and purposes of the municipality."  *Id.* (citation and internal quotation marks omitted).  "Any act of a municipality that is beyond such powers is invalid."  *Id.*  "If there is a reasonable doubt whether legislative power exists, the doubt must be resolved against the local governing body."  *Id.*  (citation and internal quotation marks omitted).

In applying Dillon's Rule, this Court first examines the statute or constitutional provisions that purportedly enable a municipality to act, and asks whether the plain terms of that statute expressly grant the power at issue.  *Id.*

The Constitution of Virginia provides that "tangible personal property" shall be subject to "local taxation only," as the General Assembly may prescribe.  Va. Const. art. X, § 4.  The

19

General Assembly classified "machinery and tools" as a class of tangible personal property subject to local taxation. Code § 58.1-3507(A).

The Constitution of Virginia also gives the General Assembly the specific authority over "the organization, government, and powers of any county . . . including such powers of legislation, taxation, and assessment." Va. Const. art. VII, § 2. Pursuant to that authority, the General Assembly passed Code § 15.2-950, which allows a county to

> make *appropriations* for the purposes for which it is empowered to levy taxes and make assessments, for the support of the locality, for the performance of its functions, and the accomplishment of all other lawful purposes and objectives, subject to such limitations as may be imposed by law.

(Emphasis added.); *see* Black's Law Dictionary 127 (11th ed. 2019) (defining "appropriation," in part, as a "legislative body's or business's act of setting aside a sum of money for a specific purpose"). Additionally, under Code § 15.2-940, localities can "expend funds from the locally derived revenues of the locality for the purpose of promoting the resources and advantages of the locality." By purportedly helping businesses who were "negatively impacted by the adjustment to the M&T tax," the M&T Tax Relief Program facially promoted the resources and advantages of the County. *See* Code § 15.2-940.

Although the 2017 M&T tax plan may have had the practical effect of "clawing back" the M&T tax refunds paid by the County, it did not "effectively revise previous assessments for the 2013, 2014, and 2015 Tax Years," as alleged by International Paper. The circuit court did not err in concluding that under Code § 58.1-3507(A) and Article X, Section 4 of the Constitution of Virginia, the County had the statutory and constitutional authority to impose taxes on M&T property and that the County also had authority to execute the M&T Tax Relief Program, pursuant to Code §§ 15.2-940 and -950.

### D. Uniformity

International Paper argues that the circuit court erred in granting the motion to strike its asserted claims, in Counts 4 and 5, that the County's 2017 M&T tax assessments violated the constitutionally-mandated requirement that M&T taxes imposed by a locality be uniform. International Paper asserts that the M&T Tax Relief Program was part of the County's 2017 M&T taxation process, and that payments from the Relief Program functioned as tax credits or partial tax exemptions that must be considered in determining if the 2017 M&T tax plan produced non-uniform M&T tax assessments.

International Paper argues that such tax credits, exemptions, "or anything else that affects the distribution of the [tax] burden borne by a single class of property," affect the uniformity of a tax plan, and can usurp the purpose of uniformity. It asserts that this Court has previously found uniformity violations when the legislative acts at issue had the "effect" of permitting similarly situated taxpayers to pay differently. International Paper concludes that the County's 2017 M&T tax plan was non-uniform, as evidenced by the disparate "effective tax rates," the net tax rate paid given the payments made to some M&T taxpayers by the Relief Program, paid by the M&T taxpayers. It claims that this shows the different and excessive burden placed upon an improper sub-class of M&T taxpayers—those who had overpaid their M&T taxes in previous years.

Conversely, the County argues that the 2017 M&T tax rate was uniformly applied as to all M&T taxpayers because they were all taxed using the same rate with the same method of valuation. The County contends that the M&T Tax Relief Program payments were grants and that a "grant is not a tax and does not impact tax rates or the tax levy." The County further argues that Virginia law does not recognize an "effective tax rate" in its statutes or constitution.

The County also argues that International Paper's uniformity claim is not within the scope of Code § 58.1-3984(A), which only contemplates challenges to a tax "assessment." According to the County, "assessment" refers to either the valuation of property or the levy of tax dollars. The County asserts that International Paper presented no argument against either "assessment" definition, but only challenged an "effective tax rate."

As a threshold matter, we address the County's argument that International Paper's uniformity claim is not within the scope of Code § 58.1-3984(A).

> Any person assessed with local taxes, *aggrieved by any such assessment*, may . . . apply for relief to the circuit court of the county or city wherein such assessment was made. . . . In such proceedings, except for proceedings seeking relief from real property taxes, the burden of proof shall be upon the taxpayer to show that the property in question is valued at more than its fair market value *or that the assessment is not uniform in its application*, or that the assessment is otherwise invalid or illegal . . . .

Code § 58.1-3984(A) (emphases added).

"The word 'assessment' takes on different meanings in different contexts." *R. Cross, Inc. v. City of Newport News*, 217 Va. 202, 204 n.1 (1976). As used in the first sentence of Code § 58.1-3984(A) above, "assessment" refers to the "imposition of the tax itself." *Transcontinental Gas Pipe Line Corp. v. Prince William County*, 210 Va. 550, 554–55 (1970) (interpreting the predecessor statute, Code § 58-1145 (1980)). As first used in the latter sentence of the statute that references uniformity, "assessment" seems to mean "the determination of the value of the property." *Id.*; *see also Board of Supervisors of Fairfax Cty. v. Leasco Realty, Inc.*, 221 Va. 158, 165 (1980).

Although International Paper does not challenge the valuation or method of valuation of its M&T property, Code § 58.1-3984(A) also permits a taxpayer to argue that the "assessment is otherwise invalid or illegal."

22

[W]e have held that relief under § 58-1145 [a predecessor statute of Code § 58.1-3984] is not confined to the correction of an assessment which is merely erroneous, but includes also *levies* and assessments *claimed to be unconstitutional, illegal and void*; and that the section is to be liberally construed to furnish the remedy so provided.

*City of Richmond v. Richmond-Petersburg Tpk. Auth.*, 204 Va. 596, 598–99 (1963) (emphases added).

International Paper has asserted a constitutional uniformity challenge regarding its 2017 M&T tax assessment. In its complaint, under Counts 4 and 5, International Paper cited to the constitutional provision requiring uniformity in taxation as supporting authority. Unlike the reference to uniformity in Code § 58.1-3984(A)—which narrowly pertains to property valuation—the constitutional uniformity provision states broadly: "All taxes . . . shall be uniform upon the same class of subjects . . . ." Va. Const. art. X, § 1. International Paper's assertion that the "assessment is otherwise invalid or illegal" because it is not uniform is sufficient to state a constitutional uniformity claim, which is within the scope of Code § 58.1-3984(A).

We next turn to the merits of International Paper's uniformity claim under the Constitution of Virginia.

Article X, Section 1 of the Constitution of Virginia states:

All property, except as hereinafter provided, shall be taxed. All taxes shall be levied and collected under general laws and *shall be uniform upon the same class of subjects* within the territorial limits of the authority levying the tax . . . .
. . . .
The General Assembly may define and classify taxable subjects.

(Emphasis added.) Pursuant to that constitutional authority, the General Assembly has by general law deemed "[m]achinery and tools" used in manufacturing as a separate class of tangible personal property subject to local taxation. *See* Code § 58.1-3507(A). The County's

23

taxation upon M&T property, therefore, is required to be uniform among all M&T taxpayers in the County.  With this in mind, we address the underlying principles of uniformity of taxation.

In general, constitutional uniformity is the requirement of equality in property taxation. *Shepheard v. Moore*, 207 Va. 498, 502 (1966) (holding that uniformity applies only to a "direct tax on property"); *Shenandoah Valley R.R. Co. v. Clarke Cty. Supervisors*, 78 Va. 269, 278 (1884) ("The constitution requires that all taxes, however imposed, shall be equal and uniform . . . .").  Its dominant purpose "is to distribute the burden of taxation, so far as is practical, evenly and equitably."  *Alderson v. County of Alleghany*, 266 Va. 333, 339 (2003); *Smith v. City of Covington*, 205 Va. 104, 108 (1964); *Shenandoah Valley*, 78 Va. at 278.

Uniformity, however, does not require "perfect equality," nor does the "mere inequality in the result" of a property tax, alone, violate uniformity.  *Richmond Linen Supply Co. v. City of Lynchburg*, 160 Va. 644, 648 (1933), *aff'd sub nom. National Linen Serv. Corp. v. City of Lynchburg*, 291 U.S. 641 (1934); *see also City of Norfolk v. Snyder*, 161 Va. 288, 291 (1933).  In other words, uniformity does not apply to the exact dollar number on a tax bill.  The varying quantities and qualities of property among taxpayers makes such a result impossible.

Instead, uniform taxation is "the principle that those who are similarly situated should be *treated* in a like manner by the law."  *Leasco Realty, Inc.*, 221 Va. at 166 (emphasis added) (citation and internal quotation marks omitted); *Shepheard*, 207 Va. at 501 (ruling that uniformity requires all taxpayers in a taxable class to be "treated alike").  Uniformity is thus the promise of equality of treatment among members of a tax class during the taxation process:

> The rule of taxation shall be uniform, that is to say, the course or mode of proceeding in levying or laying taxes shall be uniform; it shall in all cases be alike.  The act of laying a tax on property consists of several distinct steps, such as the assessment or fixing of its value, the establishing of the rate, etc.; and in order to have the rule or course of proceeding uniform, *each step taken must be uniform*.

24

*Knowlton v. Board of Supervisors of Rock Cty.*, 9 Wis. 410, 420–21 (1859) (emphasis added) (internal quotation marks omitted); *see Day v. Roberts*, 101 Va. 248, 251 (1903) (citing favorably to *Knowlton*, 9 Wis. at 420–21). Thus, uniformity applies to all "steps" of determining property tax liability. *Day*, 101 Va. at 251; *see also R. Cross, Inc.*, 217 Va. at 207 ("The requirement of equality and uniformity is satisfied by such regulations as will secure an equal rate and a just valuation . . . ."); *Norfolk & W. Ry. v. Commonwealth*, 211 Va. 692, 695 (1971) (stating that courts must enforce "equality in the burden of taxation by insisting upon uniformity in the mode of assessment and in the rate of taxation"). Once a class has been established, that class may not be taxed in two or more ways. *See e.g.*, *City of Norfolk v. Griffin Bros.*, 120 Va. 524, 532 (1917); *cf. Caffee v. City of Portsmouth*, 203 Va. 928, 932 (1962).

International Paper argues that its 2017 M&T tax assessment was non-uniform. In reply, the County asserts that its 2017 M&T tax plan consists of two distinct and discretionary legislative acts, the 2017 M&T tax rate increase and the 2017 M&T Tax Relief Program, which should not be analyzed together in determining if uniformity requirements have been violated. The County notes that uniformity is a principle applicable only to taxation and that grants such as those paid by the relief program are not taxes and should not be evaluated as part of the taxation process. The County urges this Court to consider the constitutionality of the County's 2017 M&T tax rate increase separately from the constitutionality of its imposition of a 2017 M&T Tax Relief Program.

The Supreme Court of the United States has explicitly rejected an argument similar to that the County proposes. In *West Lynn Creamery Inc. v. Healy*, 512 U.S. 186, 288–91 (1994), the Supreme Court of the United States analyzed a two-part tax scheme challenged under the

"dormant" Commerce Clause.[7]  In that case, Massachusetts passed a pricing order law to help its local dairy producers compete with out-of-state producers.  *Id.* at 190.  The pricing order had two steps.  *Id.*  First, all dairy dealers in the state—whether based in-state or out-of-state—paid a monthly "premium" into a state-run fund.  *Id.*  Second, the fund distributed that money to local dairy producers each month, as a subsidy.  *Id.* at 191.

Massachusetts defended the pricing order by making an argument similar to the County's in the present case.  Massachusetts contended that each step of the pricing order—a nondiscriminatory dairy tax and a subsidy to dairy producers—was individually lawful under the state's taxing and spending power.  *Id.* at 198.

The Supreme Court rejected that argument:

> [R]espondent errs in assuming that the constitutionality of the pricing order follows logically from the constitutionality of its component parts.  By conjoining a tax and a subsidy, Massachusetts has created a program *more dangerous to interstate commerce than either part alone.*
> . . . .
> *The choice of constitutional means—nondiscriminatory tax and local subsidy— cannot guarantee the constitutionality of the program as a whole.*

*Id.* at 199–201 (emphases added).  The Court accordingly held that the pricing order was unconstitutional because its "avowed purpose and its undisputed effect" was to discriminate against out-of-state dairy producers.  *Id.* at 194.

Our decision in *Marshall v. Northern Virginia Transportation Authority*, 275 Va. 419, 425–26 (2008), similarly emphasized that legislative means that are constitutional on their face do not protect legislation from being struck down for accomplishing an unconstitutional end.  In

---

[7] The "dormant" Commerce Clause refers to a provision in the Commerce Clause that prohibits states from passing economic protectionist laws that discriminate and burden interstate commerce.  *West Lynn Creamery*, 512 U.S. at 192.

*Marshall*, the General Assembly created the Northern Virginia Transportation Authority (NVTA), and delegated discretionary power to the NVTA to impose regional taxes in a piece of legislation called Chapter 896. The Commonwealth argued, in part, that Chapter 896 did not represent a delegation of the General Assembly's taxing power because Chapter 896 specified the form, substance, and use of the regional taxes and thus the General Assembly retained power over the regional taxes. *Id.* at 431.

We held that Chapter 896 was a delegation of power because it gave the NVTA full discretion to decide whether to impose the tax. *Id.* at 432. We therefore concluded that Chapter 896 was an unconstitutional delegation of the General Assembly's taxing power, noting:

> The General Assembly [] may not accomplish through Chapter 896, *indirectly, that which it is not empowered to do directly*, namely, impose taxes on the citizenry in the absence of an affirmative, recorded vote of a majority of all members elected to each body of the General Assembly.

*Id*. at 435 (emphasis added).

*West Lynn Creamery* and *Marshall* exemplify the analysis used in determining whether legislation is constitutional; such analysis emphasizes the effect created by legislation, rather than applying a formalistic analysis focusing on the constitutionality of the legislative means used to create that effect. *See also Ehrlich v. City of Racine*, 132 N.W.2d 489, 490 (Wis. 1965) ("We are unable to give judicial absolution to a two-stage tax differential which would be a constitutional transgression if done in one stage."). Even though the County's legislative means for creating its 2017 M&T tax plan—a tax rate increase with relief payments to some M&T taxpayers—may have been created in a facially constitutional manner, such constitutional means do not guarantee that the actions of the County did not have an unconstitutional effect.

"When the application of a law is fairly challenged under the Constitution, it is our duty to examine *its actual effect* upon those subject to it, *regardless of the origin of the factors which*

27

*combine to produce that effect*." *Benderson Dev. Co. v. Sciortino*, 236 Va. 136, 150 (1988) (emphases added) (evaluating constitutionality of statute under special laws provision). We thus determine whether a legislative act produces an unconstitutional effect, "regardless of the name attached to the act" or how it "may be framed." *Marshall*, 275 Va. at 431 (holding that a statute was an unconstitutional delegation of taxing power); *Almond v. Day*, 197 Va. 419, 428 (1955) (evaluating constitutional prohibition against appropriations of public funds to private schools); *accord City of Detroit v. Murray Corp. of Am.*, 355 U.S. 489, 492 (1958) ("[I]n passing on the constitutionality of a state tax we are concerned only with its practical operation, not its definition or the precise form of descriptive words which may be applied to it."); *Alabama Alcoholic Beverage Control Bd. v. Henri-Duval Winery, L.L.C.*, 890 So. 2d 70, 78–79 (Ala. 2003), *as modified on denial of reh'g* (Apr. 30, 2004) ("The trial court in this case erred because it allowed its analysis to be controlled by the form of the table-wine tax scheme."); *Sheehy v. Public Emps. Ret. Div.*, 864 P.2d 762, 768–69 (Mont. 1993) (rejecting the government's form of a payment as a retirement benefit in favor of deeming it a tax rebate).

Any act that "has the effect" of allowing one taxpayer to pay "less than another [taxpayer] similarly situated might be required to pay" offends uniformity, no matter how the different treatment is effected. *See Industrial Dev. Auth. of City of Chesapeake v. Suthers*, 208 Va. 51, 61–62 (1967).

In *Suthers*, for instance, we held that a tax scheme permitting localities and taxpayers to negotiate local property taxes resulted in non-uniformity. *Id.* In that case, a statute authorized localities to create industrial development authorities to "acquire, own, lease, and dispose of properties for the promotion of industry." *Id.* at 52. The statute established a system in which lessees of the development authority's property could pay rent to the authority "in lieu of and

28

equal to local property taxes and assessments upon the property of the authority so leased." *Id.* at 60. The statute also allowed the development authority and the locality to "agree at any time to a definite sum to be paid as local property taxes and assessments throughout the duration of the lease." *Id*.

In holding that this legislative scheme violated the uniformity of the applicable tax assessments, we determined the nature of the law and its lack of uniformity by analyzing its practical effect:

> [The statute at issue] *has the effect* of exempting the lessee of industrial authority property from the payment of a leasehold interest tax imposed pursuant to Code, s 58—758.
>
> . . . .
>
> [The statute at issue] *has the further effect* of permitting taxation by agreement rather than by the levy and collection of taxes under general law as required by s 168 of the Constitution.
>
> Finally, [the statute at issue] *has the effect* of permitting non-uniformity of taxation in violation of [constitutional uniformity], not only as between lessees of industrial authority property in a municipality but also as between lessees of such property and lessees of other tax exempt property.

*Id.* at 61 (emphases added).

The statute created non-uniformity among all lessees of the development authorities, in their taxation, because their property taxes would vary "as the abilities of the negotiators vary," and also between the authorities' lessees and those leasing similar properties not owned by the development authority; the latter of which being "left to the mercy of the assessing authorities" without any negotiation power. *Id*.

> [T]he idea of taxation imports equality of apportionment . . . [I]t is this which distinguishes taxation from arbitrary exaction . . . [*T*]*he exemption of the property* of one person casts an inequitable burden on others not thus graciously favored.

*Suthers*, 208 Va. at 61–62 (emphasis added); *see Warwick County v. City of Newport News*, 153 Va. 789, 817 (1930) (citing favorably to circuit court's ruling that uniformity applies to

exemptions). Tax exemptions must be considered in determining the uniformity of a tax because, "if a municipal corporation could, at pleasure, exempt the property of one person, it could exempt the property of all," and therefore avoid uniformity requirements. *Whiting v. Town of W. Point*, 88 Va. 905, 909 (1892).

We focus on the effect of legislation because a legislature may not accomplish "indirectly, that which it is not empowered to do directly." *Marshall*, 275 Va. at 435; *McClintock v. Richlands Brick Corp.*, 152 Va. 1, 23 (1928) (analyzing validity of statute under constitutional provision preventing General Assembly from granting special privileges or rights); *see also Clinchfield Coal Co. v. Robbins*, 261 Va. 12, 20 (2001) (holding that a commissioner of the revenue "may not do indirectly what he cannot do directly" by statutory grant). "The choice of constitutional means . . . cannot guarantee the constitutionality of the [legislative] program as a whole." *West Lynn Creamery*, 512 U.S. at 201 (holding that a tax and a subsidy collectively violated the dormant Commerce Clause).

The Supreme Court of Wisconsin considered a case similar to this case. In *State ex rel. La Follette v. Torphy*, 270 N.W.2d 187, 188 (Wis. 1978), a Wisconsin state statute provided tax credits to all property owners of buildings and garages that had recently experienced tax increases because of improvements to those buildings or garages. *Id.* at 188. The tax credit was available to only two classes of property owners: owners of one or two-family dwellings valued less than $50,000, and owners of rental properties with three or more living units valued less than $75,000. *Id.* The credit set off any tax liability the property owner may have had with the state's department of revenue. *Id.*

The Supreme Court of Wisconsin held that the tax credit statute violated uniformity. *Id.* at 191–93. The court held that the statute was, in fact, part of the taxation process. *Id.* at 191

30

("The initial question is whether the Improvements Tax Relief law is a tax statute subject to the uniformity clause."). It observed that the language of the tax credit statute stated it was a "tax relief" statute. *Id.* (internal quotation marks omitted). It further reasoned that the credit was "founded upon the characteristics of particular properties, not the characteristics of the individual owners." *Id.*

> No attempt is made to ascertain whether the particular taxpayer is in need of a tax credit. The taxpayer's financial situation is irrelevant since it is the property that qualifies for the credit.

*Id.* It also observed that the credit was "integrated to the property tax process through the involvement of the local taxing authority by requiring [the authority] to provide assessment figures necessary to calculate the credits." *Id.*

The court thus held that tax credit statute effectively provided a partial tax exemption of property and therefore violated uniformity. *Id.* at 192. The court noted:

> Although the instant statute provides for the payment of the tax credit from the general revenues, it is in substance a tax statute because it *has the effect of changing the individual tax burden by granting a partial exemption. . . .* The fact that a rebate credit is paid to certain property owners and not to others leads to the indisputable conclusion that taxpayers owning equally valuable property will ultimately be paying disproportionate amounts of real estate taxes. This is not uniformity.

*Id.* at 192–93 (emphasis added).

We find that the Supreme Court of Wisconsin's decision in *Torphy* is in accordance with Virginia jurisprudence. The Wisconsin opinion rejected any formalistic analysis which would accept the government's label of the legislation at issue as determinative, and instead analyzed the "effect" of the legislation. *See Torphy*, 270 N.W.2d at 192; *Suthers*, 208 Va. at 61. The Supreme Court of Wisconsin also applied a method of analysis similar to that used by our Court in *Suthers*, to determine whether the tax credit was effectively a partial tax exemption, which affected the uniformity of the tax in dispute. *See Torphy*, 270 N.W.2d at 191–92; *Suthers*, 208

31

Va. at 61; *accord Nextel Commc'ns of Mid-Atl., Inc. v. Commonwealth, Dep't of Revenue*, 171 A.3d 682, 698 (Pa. 2017) ("[E]ven . . . where the statute imposing the tax did not explicitly exempt certain individuals from paying it, but, through its structure and operation, effectively guaranteed that some individuals would be entirely excused from paying any share of the tax burden, our Court has also found the tax to be in violation of the Uniformity Clause.").

There are particular factual aspects that warrant consideration in determining if a particular legislative act is within the taxation process, such as whether a grant or tax credit provided to a taxpayer is for a stated purpose directly related to the tax, or whether it is structured and administered to directly reduce a specific tax obligation. *See Suthers*, 208 Va. at 60; *Torphy*, 270 N.W.2d at 191. Legal scholars have recognized that a government's structuring of legislative relief "as a method of directly reducing [a tax] obligation" is probative of such legislative relief being effectively part of the taxation process. Dan T. Coenen & Walter Hellerstein, *Suspect Linkage: The Interplay of State Taxing & Spending Measures in the Application of Constitutional Antidiscrimination Rules*, 95 Mich. L. Rev. 2167, 2197–98 (1997). Other factual correlations that could lead a court to conclude that a legislative act is effectively part of the taxation process include whether the legislative act was enacted at substantially the same time as the tax act, whether the legislative relief act lasts for the same duration as the tax, or whether the legislation's funding is linked to the tax. *Id.* at 2200–01, 2232.

In summary, uniformity requires equality in every aspect of the taxation process. In determining whether application of a tax plan resulted in a non-uniform assessment, we must consider the effect of the tax plan upon those subject to it, rather than the government's stated label for its actions. Exemptions are part of the taxation process. In making a determination as to whether a particular act is part of the taxation process, we consider the factual aspects of a

legislative act, such as its intended purpose, its structure and administration, and its factual correlations to the tax it allegedly affects. If such a legislative act is part of the taxation process, we then determine whether such act produces a non-uniform effect among a constitutionally-protected class of taxpayers.

Accordingly, here, we must determine whether the Relief Program was effectively part of the 2017 M&T taxation process. To prevail on its uniformity claim, International Paper needed to prove that the M&T Tax Relief Program was effectively integrated into the M&T taxation process, and that the 2017 M&T tax plan resulted in 2017 M&T tax assessments that were not uniform.

A tax "exemption" is a "[f]reedom from a general duty or service; immunity from a [tax]." *City of Winchester v. American Woodmark Corp.*, 250 Va. 451, 456 (1995) (citation and internal quotation marks omitted). It also means a "freedom from any charge or obligation to which others are subject." *Id.* (citation and internal quotation marks omitted). A "grant" is synonymous with a "subsidy," which is a "grant, usu[ally] made by the government, to any enterprise whose promotion is considered to be in the public interest." Black's Law Dictionary 1728 (11th ed. 2019). A tax "credit" is the "amount subtracted directly from one's total tax liability, dollar for dollar, as opposed to a deduction from gross income." Black's Law Dictionary 1762 (11th ed. 2019). A grant, tax credit, or other payment which is interwoven into a taxation process is effectively an exemption, which should be considered in determining the uniformity of the tax. *See Suthers*, 208 Va. at 61; *see also Torphy*, 270 N.W.2d at 194; *see also Whiting*, 88 Va. at 909.

33

We hold that International Paper provided prima facie evidence sufficient to show that the M&T Tax Relief Program payments were integrated into the M&T taxation process and that the M&T Tax Relief Program payments had the same effect as partial tax exemptions.

First, the stated purpose of the M&T Tax Relief Program was to relieve liability from the 2017 M&T tax rate increase. The Board's resolution implementing the M&T Tax Relief Program specifically noted that the payments were for "business[es] negatively impacted by the adjustment to the M&T tax." The phrase, "the adjustment of the M&T tax," refers to the 2017 M&T tax increase to a rate of $4.24 per $100 of assessed value. The stated goal of the M&T Tax Relief Program was therefore tethered exclusively to 2017 M&T tax assessments.

Although Popovich and Commissioner Gwaltney testified that the M&T Tax Relief Program was intended to keep M&T businesses from leaving the County, the M&T Tax Relief Program's incentive for keeping these businesses was to effectively discharge some members of the M&T taxpayer class from M&T tax liability. Additionally, Commissioner Gwaltney testified that the M&T Tax Relief Program was designed to ensure that no M&T taxpayer "would be harmed" by the increased tax rates. The M&T Tax Relief Program thus had a purpose, at least in part, to relieve liability from the 2017 M&T tax for a sub-class of M&T taxpayers, deemed by the County to be "harmed" by the M&T tax rate increase.

Second, the County structured and administered the M&T Tax Relief Program to directly exempt M&T tax liability. Elder testified that the County's economic development office was not involved in the creation or implementation of the M&T Tax Relief Program, despite that office having the same stated purpose expressed regarding the M&T Tax Relief Program—to promote and retain businesses in the County. The M&T Tax Relief Program's origin and

34

administration thus occurred entirely within the County's Commissioner of the Revenue office, which tends to show that the M&T Tax Relief Program was integrated into the taxation process.

Further, the payments from the M&T Tax Relief Program directly offset M&T tax liability. The County automatically subtracted the relief payment amounts from each taxpayer's 2017 M&T tax bill, without any taxpayer applying for such payment. The payments also did not apply to any taxpayer outside the class of taxpayers who owned M&T tax property. The payments were not contingent upon any personal financial circumstances of the taxpayer other than whether they had received an M&T tax refund from the County. The M&T Tax Relief Program was thus designed and implemented to directly and automatically exempt a sub-class of M&T taxpayers from M&T tax liability.

Third, the M&T Tax Relief Program factually correlated with the 2017 M&T tax rate increase to $4.24 per $100 of assessed value. Both the 2017 M&T tax rate and the M&T Tax Relief Program were enacted at substantially the same time—in May and June 2017, respectively. They both applied for the same time period—the 2017 tax year. As Popovich testified, the M&T Tax Relief Program was a one-time, "unique" legislative act contemplated to coincide with the 2017 M&T tax rate increase.

Additionally, the M&T Tax Relief Program was funded predominantly by the 2017 M&T tax rate increase. The Board authorized $32,125 in spending for the M&T Tax Relief Program, but distributed nearly $1.2 million in relief payments. That additional revenue came from the anticipated 2017 M&T tax revenue produced by the increased tax rate, which was forgiven by way of the relief payments. Although the revenue from that tax was assigned to the general fund, the Board explicitly noted, in its July 2017 resolution, that $1,164,274 raised by the 2017 M&T tax would be dedicated to the M&T Tax Relief Program. Popovich also testified that part

35

of the 2017 M&T tax revenue became "restricted" for the M&T Tax Relief Program once assigned to the general fund. The County always contemplated the revenue from the 2017 M&T tax rate increase to provide the principal source of funds for the M&T Tax Relief Program.

Most telling, the Relief Program computationally correlated with the M&T taxation process. The County determined the amount of the M&T Tax Relief Program payments by subtracting each taxpayer's hypothetical 2016 M&T tax calculation from the initial 2017 M&T tax calculation, which produced the net tax increase. The County then subtracted the M&T tax refund amount each taxpayer received for tax years 2013–15 from the net tax increase to determine the amount of the M&T Tax Relief Program payment the taxpayer would have received as a credit. If the resulting amount was a negative number for a taxpayer, the County did not award any relief to that taxpayer. The County thus awarded relief payments only to M&T taxpayers who experienced a net tax increase that was greater than the amount of the tax refund they had received for tax years 2013–15, exempting that sub-class of M&T taxpayers from the burden of the 2017 M&T tax rate increase.

The payments from the M&T Tax Relief Program were calculated exclusively with M&T taxation figures. The County calculated the payments based on (1) the value of each taxpayer's M&T property in tax year 2017, (2) the tax rates for tax years 2016 and 2017, and (3) the amount the taxpayer received as a tax refund, which was based on the change in valuation of M&T property and tax rates in past years. Thus, the M&T Tax Relief Program formula only used factors that related to an aspect of the M&T taxation process in determining the amount of tax relief a taxpayer was entitled to receive.

In short, International Paper produced evidence to support its contention that the County intended, structured, funded, administered, and calculated the M&T Tax Relief Program

36

payments almost entirely within the closed circuit of the M&T taxation process, and that the M&T tax rate increase and the M&T Tax Relief program were both part of an interwoven 2017 M&T tax strategy. Thus, International Paper provided sufficient evidence to prove that the M&T Tax Relief Program was part of the 2017 M&T taxation process.

By design, the relief formula treated the M&T taxpayers differently based upon whether the County had lawfully owed that taxpayer a refund on M&T taxes overpaid in prior years. This created a sub-class of M&T taxpayers. The amount of refund a taxpayer had been owed by the County and the amount of the relief payment the taxpayer received under the Relief Program were negatively correlated—the larger the refund an M&T taxpayer received, the smaller the relief payment. Only those M&T taxpayers who had received a refund owed to them by the County were required to pay the 2017 M&T tax increase.

International Paper also produced evidence that the "effective tax rates," the net tax rate paid by M&T taxpayers given the payments made to some M&T taxpayers by the Relief Program, considering payments granted to some taxpayers by the M&T tax plan, were not uniform. Although the varying "effective tax rates" among M&T taxpayers are not the cause of the non-uniformity, they were provided as indicia of the non-uniformity in the assessments levied under the 2017 M&T tax plan. Davis opined at trial that, in tax year 2017, 39 M&T taxpayer accounts paid according to the $4.24 rate, 28 accounts paid according to a $1.75 rate, and 33 accounts paid somewhere in between those two rates. International Paper was assessed at an effective rate of $3.94 per $100 of assessed value. According to International Paper, these varying effective tax rates further exemplify the non-uniform assessments produced by the 2017 M&T tax plan, and support International Paper's claim.

Viewing the evidence in the light most favorable to International Paper, we hold that International Paper provided prima facie evidence sufficient to show that the M&T Tax Relief Program operated effectively as a partial tax exemption that was part of the 2017 M&T taxation process, and that International Paper's 2017 M&T tax assessment was non-uniform, invalid, and illegal. The circuit court erred in sustaining the County's motion to strike Counts 4 and 5 of International Paper's application.

### III. CONCLUSION

For the foregoing reasons, we hold that the circuit court did not err in sustaining the County's motion to strike as to Counts 1, 2, and 3 regarding vested rights, separation of powers, and the County's alleged lack of statutory authority. We hold that the circuit court erred in sustaining the County's motion to strike as to Counts 4 and 5 regarding uniformity. We therefore reverse the judgment of the circuit court, in part, and will remand this case to the circuit court for further trial proceedings in accordance with this opinion.

*Affirmed in part,*
*reversed in part,*
*and remanded.*